STATE *ex rel.* D. K. PITTMAN *et al.*, Plaintiffs in Error, *v.* JOHN ADAMS *et al.*, Defendants in Error.

1. *Corporations — St. Charles College — Amendment of charter impaired obligation of contract.*—By the charter of "St. Charles College," it was required to be "an institution, purely literary, affording instruction in ancient and modern languages, the sciences and liberal arts, and not including or supporting by its funds any department for instruction in systematic or polemic theology, nor instituting any regulations which should render a place in its classes offensive to reasonable or liberal-minded persons, whatever may be their religious opinions." The amendment of the charter, approved February 6, 1847 (Sess. Acts 1847, p. 226), provided that "the concurrence of the Missouri Annual Conference of the Methodist Episcopal Church South" should "be requisite in filling all vacancies in the board; upon the conference affording to the board satisfactory assurances for the maintenance and endowment of the college." *Held,* that the amendment, by requiring the

State ex rel. Pittman et al. v. Adams et al.

concurrence in the choice of curators, of an ecclesiastical body representing one of the religious denominations of the State, endangered, in this regard, the principles of the foundation; and, even if it did not, it changed the character of the administrators of the trust, hindered the free choice of their successors, according to the will of the founder, by the men to whom he had intrusted his bounty, and essentially impaired the contract upon which he advanced it.

2. *Corporations, moneyed and charitable—Stockholders—Visitors.*— In moneyed corporations, the trustees have no general powers. They are simply the agents of the shareholders, and under their control. The law of visitation, as applied to charities has no application to them. But in eleemosynary corporations there are no stockholders, and regulations that ordinarily are made by them, and disputes that are submitted to the courts, are made and decided by those intrusted with the visitorial power.

3. *Corporations—Moneyed and eleemosynary—Visitors—Duties of.*—In this country, moneyed corporations composed of shareholders, for whose use and benefit the charter is granted, may, in general, accept amendments thereto. But in charities the corporators are not the owners of the fund; neither is it held for their use. Their consent would not affect their own property but that of others, and their office of visitors, so far from giving them power to authorize any change in its management and control, contrary to the will of the founder, imposes upon them rather the obligation of seeing that that will is made paramount.

4. *Corporations—Visitors may consent to legislative change, when.*—Various changes may be found necessary in furtherance of the objects of a charitable institution which its visitors should have authority to make, or assent to, if such objects require an amendment to the charter. But if the general power of consent to legislative amendments is lodged in the directors or curators, there is no security whatever in eleemosynary grants.

5. *Corporations, eleemosynary—Legislative amendments—Curators—Consent of.*— The curators of an eleemosynary institution, the grant of which by the Legislature is absolute, subject only to the conditions imposed, have no power over the charter, but on the contrary it is their creator and their absolute rule of conduct. The beneficial interest in the charity fund belongs neither to them nor the State, but to the beneficiaries only, who, from the nature of the case, can not consent to any changes in the charter. Hence, its essential conditions are permanent, so far as change depends upon consent, and the acceptance of a legislative amendment to the charter of such an institution by its board of curators gives it no validity.

6. *Corporations—Officers, removal of, for disloyalty—Act of March 23, 1863, validity of.*— The Legislature of this State, pending the late contest, had power to take measures to remove from the management of corporations of a public nature those who came within the purview of the oath commonly called the convention oath. (*Vide* act of March 23, 1863, Sess. Acts 1863, p. 12.) The act was not a violation of the contract embraced in the charter, for fidelity to the State is embraced in every such contract. The duty of loyalty is antecedent, perpetual, and paramount; and, in granting a charter, the State can make no engagement to dispense with that duty.

7. *Act of December 11, 1863, in the nature of an act of attainder —Article II, of constitution in force in 1863.*— The act of December 11, 1863 (Adj. Sess. Acts 1863, p. 645), ousting the board of curators of St. Charles College for having failed to take and subscribe the oath required by the act of March 23 (Sess. Acts 1863, p. 12), assumed, without judicial findings, that the board of curators had forfeited their position; it cut off any defenses which they might make upon a trial of their right to office, declared vacancies which had not been created, and proceeded to fill them. It was, therefore, in the nature of a bill of attainder, and equally unjust and odious, and unknown to our jurisprudence. Such judicial action 'was also expressly guarded against by article II of constitution, in force in 1863, which prohibited the union of the legislative and judicial power.

8. *Constitution — Act of Legislature declaring forfeiture — Legislative judgments.*— The recitals in a statute will in general be taken as correct. But an act declaring a forfeiture, if outside of legislative authority, can not be strengthened by reciting facts that might judicially work a forfeiture, unless those facts have been judicially passed upon. An act may recite a judgment of forfeiture as a proper foundation for any legislation warranted by such judgment, but the question of forfeiture is strictly judicial. And the Legislature can not constitutionally know either that the facts exist or their legal effect.

9. *Corporations — Powers of amotion — Trial essential before amotion.*— The power of amotion is judicial in its character, and generally exercised by the courts of the land, though it may be given to the corporation by its charter, and, even if the charter is silent, an officer or corporator, in some classes of corporations, may be expelled for sufficient cause. But it is essential, in every case, that charges be made, a trial had, and that the accused be notified and have a full opportunity for defense.

10. *Act of March 23, 1863, created no vacancy in board of curators of St. Charles College.*—The act of March 23, 1863 (Sess. Acts 1863, p. 12), did not, *proprio vigore*, create any vacancy in the board of curators of St. Charles College, nor did it purport to do so.

### Error to Sixth District Court.

*E. A. Lewis*, for plaintiffs in error.

I. The act of December 11, 1863, was inoperative and conferred no title to the curatorship on the defendants in this case. (Fletcher v. Peck, 6 Cranch, 87, 136 ; State v. Wilson, 7 Cranch, 164 ; Pawlet v. Clark, 9 Cranch, 292 ; 1 Kyd on Corporations, 16 ; Wales v. Stetson, 2 Mass. 143, 146 ; Terret v. Taylor, 9 Cranch, 43.)

II. If the amendment of 1847 was invalid for any cause, it was simply a nullity. It had no operation for any purpose, and,

least of all, for vitiating the original charter or effecting a forfeiture.

III.  If by any means a forfeiture was inaugurated, the Legislature had no power to proceed upon it as a consummation, until the fact had been judicially ascertained and adjudged.

*Thomas Bruere,* for defendants in error.

I.  The act of December 11, 1863, is valid and effectual to vest the curatorship of St. Charles College in the defendants.

II.  The act of February 6, 1847, and the acceptance of said act by relators, the filling of vacancies in the board of curators, and the appointment of most of said relators as curators, with the concurrence of the Methodist Episcopal Church South, were violations of the original charter.

BLISS, Judge, delivered the opinion of the court.

The circuit attorney of the 19th judicial circuit filed in the St. Charles Circuit Court an information, in the nature of a *quo warranto,* on the relation of David K. Pittman, Andrew Monroe, Trusten Polk, Asa N. Overall, Daniel A. Griffith, Samuel Overall, Norman Lackland, Lloyd Dorsay, Wrenshall D. Fielding, John A. Talley, James S. M. Gray, Thos. W. Cunningham, James Campbell, Robert B. Frazier, Richard E. Bland, Dennis McDonald, John W. Robinson, John Atkinson, Joseph Boyle, Enoch M. Marvin, Edward A. Lewis, and David K. McAnally, against John Adams, George A. Buckner, Peter Hansen, Robert Bailey, Sr., Theodore Bruere, Nathaniel Reid, Henry Borgman, Benjamin Emmons, Jr., W. B. Adams, James H. Robinson, Henry A. Clover, Charles D. Drake, Dr. M. L. Linton, Dr. John Conzelman, and Frederick Muench, charging them with usurping the office of curators of the St. Charles College, and alleging that the relators are rightfully entitled to the office.

The relation sets forth, in full, the charter of the college, granted February 3, 1837, which recites that the institution was founded and has been supported at the private expense of George Collier ; that, for the purpose of giving it permanence, elevation, and extensive usefulness, he desires, with the aid of others, to

37—VOL. XLIV.

endow it and place it under the direction of a board of curators, who shall conduct it on the principle of its foundation, namely: as an institution purely literary, affording instruction in ancient and modern languages, the sciences and the liberal arts, and not including or supporting by its funds any department for instruction in systematic or polemic theology, nor instituting any regulations which should render a place in its classes offensive to reasonable, liberal-minded persons, whatever may be their religious opinions; and enacts that George Collier and twenty-eight other persons (naming them), including said Trusten Polk, David K. Pittman, and Andrew Monroe, and their successors, become a body corporate under the name of the "Board of Curators of St. Charles College." The charter provides for the organization of the board, twelve constituting a quorum, for filling vacancies by the board, expelling members for cause, and gives other necessary and usual powers for the ends of the organization.

The relators set forth an amendment to the charter, approved February 6, 1847, changing, somewhat, the character of the institution, by placing it under ecclesiastical influence or control, which amendment provides that the concurrence of the Missouri Annual Conference of the Methodist Episcopal Church South shall be requisite in filling all vacancies in the board, upon the Conference affording to the board satisfactory assurances for the maintenance and endowment of the college; and they proceed to state the regular organization of the board; that it met and transacted business regularly under the original act of incorporation and its amendment until their ouster; and particularly that on the 21st of December, 1850, the amendment was regularly accepted by the board.

They also state that, except the said Pittman, Monroe, and Polk, who were named in the original charter, all the other relators were duly elected members of the board to fill vacancies as they occurred, specially setting out the time of each election, and that all the elections after February 6, 1847, were with the concurrence of the Missouri Conference of the M. E. Church South; that they all took upon themselves the duties of their office, continued to hold and enjoy the same until the wrongful

usurpation of defendants, and are still entitled to the same. The relation charges that the defendants, on the first of January, 1864, usurped and intruded into the office of members of the board of curators, and. have ever since unlawfully held the same under color of authority granted by the act of the General Assembly, approved December 11, 1863, amendatory of the original act of incorporation ; avers that the board never accepted said amendment to the charter ; that it is in conflict with the original act and its former amendment, and with the constitution of the United States, and is null and void. The preamble to the last-mentioned act recites that a large majority of the members of the board of curators of St. Charles College have failed to take and subscribe the oath required by an act of the General Assembly, entitled "An act relative to railroad directors and other officers or trustees of any incorporated company or institution," approved March 23, 1863, and that " by the terms of the last recited act, the offices of said curators so failing to take and subscribe said oath have been and are vacated ;" and that " in consequence of the vacancies in said board of curators the number of qualified curators has been diminished so that a quorum for the transaction of business can not be had ;" and the act appoints the defendants, together with Arnold Krekel, John Orrick, and Edward A. Lewis, qualified curators of the old board, as the curators of the college, and makes some other amendments not important to consider. The defendants demur to the information, and judgment was rendered in their favor in the Circuit Court, which was affirmed in the District Court.

The defendants combat the claim of relators upon the fundamental ground that most of them were never entitled to their positions, not having been elected according to the provisions of the original charter, but under an amendment, itself a violation of that charter, and also upon the ground that they were properly ejected by the act of December, 1863, for not having taken the oath required by the act of March previous. The relators, on the other hand, contend that this amendment was lawful ; that the acts of March and December, 1863, were unconstitutional, and that their removal was illegal.

The relators may have, first, an absolute right to their places— a right that would be sustained without reference to the question of possession, and even under lawful judicial proceedings against them; or, second, a right to continue in possession until removed by such proceedings. Our views upon the second question might relieve us from the expression of any opinion upon the matters embraced in the first; but the labor of counsel and the attention of the courts below have been chiefly directed to them, and their decision will become necessary to a final settlement of the controversy. The interests of the college and of the community require an early adjustment of all matters in dispute, without the necessity of again coming before this court.

Both parties seem to rely upon the same general principles governing corporations, and the power of the State over them· and the relators especially press upon our consideration the authority of the case of The Trustees of Dartmouth College v. Woodward, 4 Wheat. 518.

The limitations upon the power of the Legislature over a corporation like the St. Charles College, as elucidated in the able and elaborate opinions in the great Dartmouth College case, leave little to be said except in their application. That such corporations are private as opposed to municipal, or such as are owned entirely by the State; that they are strictly eleemosynary, contributing to our higher wants, and generally furnishing, to the comparatively poor, opportunities otherwise beyond their reach; that private contributions for the endowment of institutions of learning, on the faith of a charter, constitute a contract between the contributors and others interested and the State; that the contribution is a sufficient consideration for the franchises given by the charter, the whole constituting a valid and binding agreement not to be impaired by the State nor avoided by the corporation; that the trustees named in the charter, and those chosen as their successors according to its terms, are not only trustees of the fund, but also take the place of the founder of the charity as its lawful visitors and overseers — their trust implying an obligation to govern according to the statutes of the founder as embodied in the charter; that in fulfilling this obligation they

can be controlled as other trustees, the only duty of the courts being to see that the trust is faithfully executed; and that any statute making a substantial change in the charter, as by the addition of new trustees, or by a material change in the manner of choosing them, in the mode of expending the funds, or in the objects of the charity, impairs the obligation of the contract, and is forbidden by the constitution of the United States, are propositions recognized or established in that case and substantially followed in all others. We have nothing now to do with the many disputed applications of the doctrines of that case to other classes of corporations; but, so far as such charities as the one involved in this cause are concerned, we regard them as eminently just and beneficial — just in recognizing one's right to do what he will with his own, and beneficial in encouraging benevolent gifts. But for the stability of such grants, and the fidelity of their administration under the law of England, those old colonial institutions that have played so important a part in our civilization and progress would not have existed; and, if donors are now made to feel any doubt as to the security of their endowments, our many promising establishments dependent upon private liberality must fail.

The charter of St. Charles College, it is seen, expressly describes Mr. Collier as its founder. The corporators are named, and provision is made for the choice of their successors in a particular manner. The college was to be unsectarian in its character, at least in this, that no power or control over it was given to any ecclesiastical body; and it was expressly provided that the board of curators should conduct it on the principles of its foundation, which were declared to be purely literary, embracing languages, science, and the liberal arts, and expressly excluding theology. The board also were forbidden to make any regulation rendering a place in the classes offensive to reasonable, liberal-minded persons, whatever their religious opinions. It would have been difficult to more emphatically provide for the exclusion of special or denominational religious influences. The declared objects and principles of the foundation are inconsistent with it, and the choice of future curators is to be uncontrolled by any

ecclesiastical body or personage. We do not, hence, suppose that the founder intended to exclude all influence from, or instruction in, the great principles of Christian ethics, the basis of all character, the foundation of good citizenship and just government, and which are professedly adopted by men of all creeds; but he did intend to prevent the institution from becoming in any special sense a theological or religious school. The amendment to the charter, by requiring the concurrence in the choice of curators, of an ecclesiastical body representing one of the religious denominations of the State, endangers, in this regard, the principles of the foundation; and, even if it did not, it changes the character of the administrators of the trust, hinders the free choice of their successors, according to the will of the founder, by the men to whom he had intrusted his bounty, and essentially impairs the contract under which he advanced it.

The only question that can arise under this branch of the case pertains to the validity of the acceptance of this amendment by the curators. It is true there is a great difference between the powers of the trustees of an eleemosynary corporation, with visitorial powers, like a college or a hospital, and those of a private moneyed corporation, like a bank or railroad. The latter are composed of shareholders, each of whom is a member of the company, who make the by-laws and all lawful regulations, elect directors for a limited period, and themselves compose the corporation. Amendments to the charter, not in violation of its objects, may be accepted by the shareholders, but the trustees have no general powers, are simply their agents, and are under their control. The law of visitation, as applied to charities, has no application to them. But in eleemosynary corporations there are no stockholders; and regulations that in ordinary corporations are made by them, and disputes that are submitted to the courts, are made and decided by those intrusted with the visitorial power. The visitor is the judge or arbiter to decide all disputed questions not involving the integrity of the management of the fund or the observance of the statutes of the founder, and he alone can make regulations and by-laws that shall bind the officers. There being no constituent members, he, in a sense, is the corporation and

controls its operations, subject only to the expressed will of the founder. By the common law, the founder and his heirs are the visitors. *Cujus est dare, ejus est disponere.* But the foundation may provide for other visitors; and, in England, that office is generally withheld from the trustees who hold the fund, in order that they may be also visited. But in this country the visitorial power over schools and colleges, together with all other powers and rights belonging to them, are usually vested in boards of curators, or trustees, established by the charter creating the corporation, who must be governed by the provisions of the charter, as embodying the statutes of the founder. The power of these boards is great, but by no means absolute. They are the creatures of the charter, or, rather, of the will of the founder, as embodied in it, and must walk in the path marked out by it. Upon the general subject of visitation, see Angell & Ames on Corporations, 3d ed., chap. 19; 2 Kent's Com. 300, 303; opinion of Judge Story in Trustees of Dartmouth v. Woodward, 4 Wheat. 518, and Allen v. McKeen, 1 Sumner, 300; Phillips v. Bury, 2 T. R. 348; Murdock's Appeal, 7 Pick. 322.

But while the trustees of an eleemosynary corporation, with visitorial powers, have more authority than those of ordinary corporate bodies, it is nevertheless strictly limited, and the language of Judge Story, in Dartmouth v. Woodward, following, in this respect, the English authorities, that the crown can not, "without the consent of the corporation, alter or amend the charter," should not be held to recognize the doctrine that, under our laws, alterations or amendments can in all cases be made with such consent. Most of the English cases discussing the power of the crown over charters, and the validity of changes with the consent of the corporation, arose with regard to corporate boroughs; and while, in this country, the Legislature which grants the charter of such corporations has undisputed power over them, in England, although held from the king alone, when once granted, they are beyond his control. (Rex v. Amery, 2 T. R. 568; Rex v. Passmore, 3 T. R. 199.) These boroughs being represented in Parliament, the liberties of England demanded that they should be independent of the king, and yet there was

no reason why they might not accept amendments to their charters. So, in this country, moneyed corporations, composed of shareholders for whose use and benefit the charter is granted, may, in general, accept amendments, for it would be unreasonable to prevent those who make a contract for their own use, from consenting to a change of its terms. But this consent must be the act of the corporators or shareholders themselves, and not of their trustees, and even then it has been held that the majority can not validate such amendments as materially change the objects of the association. (Hartford & N. H. R.R. Co. v. Cresswell, 5 Hill, 383—doubted in Buffalo & N. Y. R.R. Co. v. Dudley, 14 N. Y. 336.) But in charities the corporators are not the owners of the fund, neither is it held to their use; their consent would not affect their own property, but that of others; and their office of visitors, so far from giving them power to authorize any change in its management and control contrary to the will of the founder, imposes upon them rather the obligation of seeing that that will is made paramount.

If the Legislature had power, with the concurrence of the curators, to make the amendment of 1847 to the charter of St. Charles College, is there any limit in this regard? May not any changes be made? If the original trust, in all its requirements, is not obligatory, where shall the line be drawn? and what is to hinder a total perversion of the fund? If a change can be made so material as one affecting the choice of curators, I can see no limit. The naked question then arises, whether the curators or trustees of an eleemosynary corporation can validate, by petition or subsequent acceptance, any substantial change by the Legislature in the provisions of its charter.

The result of the solution of this question is not without apparent inconveniences, whichever view is held. On the one hand, if this power of change be denied, the objects of a charity, it may be said, might become obsolete, or its legitimate ends be crippled by inconvenient provisions that would embarass its operations, and this limitation of power might destroy, instead of carrying into effect, the will of the founder. But it is not necessary to hold all changes to be absolutely prohibited: for it is easy

to imagine such altered conditions of society and of pursuits that a strict adherence to all the formal requirements of a foundation might defeat its object, as, for instance, if in centuries past the founder of a college had enumerated alchemy and astrology among its studies, the study of chemistry and astronomy might be deemed a truer compliance with the object of the charity; for it should be presumed that he desired the pursuit of the substance rather than the shadow, even though he had been able to see only the shadow. So other changes may be found necessary in furtherance of the objects of the charity, which visitors should have authority to make or assent to, if they require an amendment to the charter. But, on the other hand, if the general power of consent is lodged in the directors or curators, there is no security whatever in eleemosynary grants. The founder may recall or change the character of his gift, even after contributions to swell it have been made by others, or the directors of the corporation administering it may fancy they have a better way, or may be personally interested in another mode. The State can do nothing alone; the directors can do nothing alone (1 Watts & Serg. 36; 1 Burr. 201); but, by their joint action, the whole character of the foundation may be changed. Our observation shows the ease with which legislative action is sometimes had, and it seems to me that the dangers to all charities—their great liability to perversion, if such changes are permitted—are more to be dreaded than the inconvenience of the restriction.

And besides, what right has the State, or those called upon to administer a charity, to dictate conditions to its founder? Those conditions may seem to us foolish fancies; we may deem ourselves far more competent to establish such as will secure the general object, but it is not ours to say. When we see fit to create such a foundation out of our own fortunes, we shall be at perfect liberty to show our wisdom, but it is out of place in administering the fortunes of others. When Mr. Girard established his celebrated college, he imposed conditions offensive to a large majority of the community. No attempt was made, I believe, to dispense with the conditions and accept the gift, though the validity of the bequest was attacked on behalf of his heirs.

One may do what he will with his own, and if his benevolent instincts lead him to expend his fortune for the good of others, public policy certainly requires that he should be made to feel quite secure in his benevolence. This security he can never feel, if his gift shall be subject to the changing opinions of its future administrators, with the frail check only of legislative consent.

Light may be thrown upon this subject by considering the nature of the grant, the relation held to it by the curators, and who are the real parties in interest. First, the grant is absolute, subject only to the conditions imposed. Subsequent contributors are subject to the same conditions, and the heaviest have no such interest as will entitle them to come into court in their own name, but, like others, they must be represented by the attorney-general. (Kemper v. Trustees of Lane Seminary, 17 Ohio, 293.) Second, the curators can govern only according to the conditions of the foundation. The interest of the corporation itself is only that of a trustee, and the power of visitation in its board is but a trust. Judge Story, in Allen v. McKeen, 1 Sumner, on page 300, says: "But what is the nature and extent of this visitorial power? Is it the power to revoke the gift, or change its uses? to divest the rights of the parties entitled to the bounty? Certainly not. It is a mere power to control and arrest abuses and enforce a due performance of the statutes of the charity." Third, the corporators, then, have no personal beneficial interest; their interest is rather a duty. Nor has the State received the grant; it has simply designated a body capable of executing its uses. Who, then, are the real parties in interest? Clearly the beneficiaries of the charity. Their right becomes, as it were, vested; they are, as it were, the equitable owners of the fund. The curators, then, having no power over the charter, but it being, on the other hand, their creator and their absolute rule of conduct, and the beneficial interest in the fund belonging neither to them nor to the State, but to the beneficiaries only, who, from the nature of the case, can not consent, I infer that the essential conditions of the charter are permanent so far as change depends upon consent.

The doctrine that the managing board can not validate any

improper legislative change, if not expressly decided, is clearly recognized in Allen v. McKeen. The State of Massachusetts founded Bowdoin College, and in the act creating the foundation reserved the right of change. By the act of separation from Maine it guaranteed the powers and privileges of the charter, but afterward authorized such changes by the trustees as should induce the Legislature of Maine to increase the endowment. Subsequently Maine made general changes in the charter, requiring, among other things, the removal of the president, Allen, which changes were acquiesced in by the trustees. The court decided that Massachusetts, as founder, having, in the original charter, reserved the right of making changes, had the power to consent to such as were made according to the terms of the reservation; but that the changes actually made were unauthorized, and that the boards of the corporation, though charged with visitorial power, could not consent to them. Upon this point Judge Story, on pages 313–14, remarks: "But it is said that the boards (of trustees and overseers) have assented to the act and have adopted it, and it has therefore become binding on the college. I think that the argument is not correct. * * But if the acquiescence of the boards could be construed into an approval of the act (as I think it ought not to be), still that approval can not give effect to an unconstitutional act. The Legislature and the boards are not the only parties in interest upon such constitutional questions. The people have a deep and vested interest in maintaining all the constitutional limitations upon the exercise of legislative powers, and no private arrangements between such parties can supersede them."

We must then hold that this alleged acceptance of the amendment of 1847, to the charter of St. Charles College, gave it no validity; that the amendment had not become necessary to further the objects of the charity, but its direct tendency was to change the principles of its administration; and that, in consenting to it, the board of curators went beyond their powers.

The relators were removed from their positions by the act of December 11, 1863, partially recited in the relation, and they claim that it was illegal, inasmuch as this act and the one to which

it refers, violated the contract of the charter, were *ex post facto*, bills of attainder, etc. The oath referred to was what is commonly called the convention oath, and is an oath of loyalty in disclaiming hostilities in the past, and promising future fidelity.

I have no doubt whatever of the power of the Legislature, pending our late contest, to take measures to remove from the management of corporations of a public nature those who came within the purview of that oath. It can not be a violation of the contract embraced in the charter, for fidelity to the State is embraced in every such contract. An alien enemy may be forbidden to live among us, and, by strict law, he may be imprisoned and his property confiscated. It will hardly be pretended that a charter involves the imperative obligation of permitting him to remain in the management of those corporations whose operations may be made to embarrass us or aid the public enemy. Nor can the right of a domestic enemy be deemed greater. The duty of loyalty is antecedent, perpetual, paramount — and in granting a charter the State can make no engagement to dispense with that duty. It enters into the contract and is a fundamental condition of the grant. This court has always sustained such police and other regulations as often, in times of tranquillity, have been imposed by the Legislature upon corporations, although they run counter to provisions in their charters. How much more in time of war when encompassed by dangers!

Nor, until the late opinions of the United States Supreme Court, had I supposed that such disability as is involved in the requirements of the oath, could be held, in the constitutional sense, an *ex post facto* law, or a bill of pains and penalties, for it does not provide in any legal sense for a trial and punishment for crime, nor is it a legislative judgment. The history of the times shows that the requirement was not intended as a punishment, either judicial or legislative, but a disability imposed upon the enemies of the State, supposed to have been demanded by pressing public danger. It was no more considered as coming within the prohibitions of the federal constitution than the many other disabilities which are imposed, without question, for the public good.

But, whatever our opinion of the power of the Legislature over

corporations, as embodied in the act of March, the act of December 11, ousting the relators, can not be sustained upon any principle known to our laws, for the reason that it is judicial in its character—a legislative judgment. Had vacancies been created by judicial proceedings, so as to reduce the board below a quorum, or had the reduction been caused by death or otherwise, by which the functions of the corporation had become suspended, the Legislature might doubtless have restored them by filling such vacancies. But this act assumes, without judicial finding, that the relators had forfeited their position; it cuts off any and all defenses they might make upon a trial of their right, declares vacancies, and proceeds to fill them. Its object and legal effect was to remove the relators by direct legislation.

It may be said that we are concluded by the recitals of the act, and that the facts recited are of sufficient foundation for the ouster. But we can not assume anything against the defendants upon the strength of the act, unless we find it to have been within the scope of legislative powers. The recitals of a judgment, if within the record and the law, are taken as true; so the recital in a statute will, in general, be taken as correct. But an act declaring a forfeiture, if outside of legislative authority, can not be strengthened by reciting facts that might judicially work a forfeiture, unless those facts have been judicially passed upon. An act may recite a judgment of forfeiture as a proper foundation for any legislation warranted by such judgment, but the question of forfeiture is strictly judicial, and the Legislature can not constitutionally know either that the facts exist or their legal effect. It would be absurd to hold that we are bound by a recital of facts which the Legislature had no right to find, and by an assumption of their effect which it had no right to declare.

The law relating to the power of amotion, a term often applied as well to the disfranchisement of a member as to the removal of an officer of a corporation, has been long and well settled. It is a power, judicial in its character, generally exercised by the courts of the land, though it may be given to the corporation by its charter, and, even if the charter is silent, an officer or a corporator, in some classes of corporations, may be expelled for

sufficient cause.　But it is essential, in every case, that charges be made, a trial be had, and that the accused be notified and have a full opportunity for defense.　The matter must be decided judicially and fairly, and, if against the accused, he then may apply to the courts for redress.　If it is there found that the corporator or officer has had a fair opportunity for hearing in his society, that the charges against him were sufficient and fairly proved, he can have no further relief, but otherwise he will be restored to all his rights.　(See Ang. & Ames on Corp. chap. 12; Boggs' case, 11 Co. 99; Rex v. Richardson, 2 Burr. 536; Com. v. St. Patrick Society, 2 Binn. 441, 448; Com. v. Guardian, etc., 6 Serg. & Rawle, 469; Com. v. Pennsylvania Benevolent Institution, 2 Serg. & Rawle, 141; Fuller v. Plainfield Academy, 2 Conn. 532; The State v. Bryce, 7 Ohio, 2d part, 82; and The Trustees of Dartmouth College v. Woodward, before cited.)

After diligent search I have not found a case where a disfranchisement or amotion will be assumed, or where it is sustained without judicial investigation, either by the corporation, according to its rules, which must be fair, and not arbitrary, or by the courts of the country having jurisdiction.

In Fuller v. Plainfield Academy, the court held that a removal of one of the trustees of the academy by the other trustees was wrongful, because made without sufficient cause; and Judge Daggett, in giving the opinion, says: "But in relation to trustees in whom is vested the visitorial power of an eleemosynary corporation, Story, J., in Dartmouth College, says there can be no amotion of them, though they are subject to the general law of the land.　Be this, however, as it may, can such removal be made without sufficient specific charges and passing upon them, judicially?　I am satisfied that the question must be answered in the negative."

The State of Ohio v. Bryce, was a motion for a writ of *quo warranto* to test the title of defendant as trustee of the Ohio University.　The university was a corporation, but the trustees were elected by the Legislature for life, with power to remove, or suspend one of their number for good cause, until the next session of the Legislature.　Mr. Linley, one of the trustees, had removed

from the State, and, without any action of the board or judgment of removal, the Legislature, by joint resolution, appointed the defendant, a "trustee, etc., to fill the vacancy occasioned by Jacob Linley having removed out of the State." Mr. Linley, returning, claimed his place in the board, and the court held that he was entitled to it; that Bryce was unlawfully appointed, because there was no vacancy. Judge Lane remarks: "This proceeding (amotion of a corporator) is essentially adversary in its character. The justice of the common law permits no investigation of facts which may be followed by the loss of a right, or the infliction of a penalty, to be conducted *ex parte*. It is essential to its validity that the party should be duly summoned. * * * In the present case, if the relator had forfeited his office by neglecting his duties, it was necessary that the corporation, after reasonable notice to him, and an opportunity for hearing, should investigate the facts, and determine his title to the office by sentence, and thus create the vacancy. Until this was done the relator was entitled to his seat, and the contingency had not happened in which the Legislature could lawfully appoint a trustee."

Further quotations would be superfluous. The law guards the right of corporators, and, through them, the rights of all interested in the uses of the corporation, with the same jealousy as other property. A fair and open trial is our instinctive demand, and is imperatively secured. The foundation, the distinguishing feature of a free government, is embraced in the spirit of that great provision — the corner-stone, as it were — of the English and American constitutions, that no one can be deprived of life, liberty, or property, except by due process of law. Such process involves a judicial investigation, with every safeguard for a full and fair hearing, according to the form and governed by the rules that control all other similar investigations. A legislative enactment can not meet the requirement. Though it may not be strictly a bill of attainder, yet it is in the nature of such bill — is equally unjust and odious, and is unknown to our jurisprudence.

Such judicial action by the Legislature was expressly guarded against by article II of the State constitution, in force in 1863,

which prohibited the union of the legislative and judicial powers; and, even without that article, the assumption, either by the Legislature or the courts, of powers belonging to the other department, ought not to be countenanced. If there is anything settled in our system of government, it is the complete separation of their functions.

It may be said that the act of December, 1863, does not purport to make a removal, but only an appointment to fill previous vacancies. There were then no vacancies to be filled. The relators aver that they were elected and acted as curators up to the time of the intrusion of defendants; that they never resigned, and were never removed or displaced until that time, and that defendants entered under authority of that act. The act itself recites the facts upon which the authority is claimed, but makes no mention of any regular removal. It recites the assumed failure of the relators to take the oath required by the act of March 23, and. speaks of the vacancy as follows: "And whereas, by the terms of the last recited act (act of March preceding), the offices of said curators so failing to take and subscribe said oath have been and are vacated; and whereas, in consequence of the vacancies," etc. Now, by referring to the act of March, it will be seen that it requires certain persons to take the oath within a certain time, and provides that those who fail to do so "shall vacate their offices," etc. But the act itself, *proprio vigore*, creates no vacancy, and does not purport to do so. It is legislative. and altogether general in its character, and can only be brought home to relators by a judicial proceeding. The Legislature, in December, could not know that relators had not taken the oath, or were bound to take it. Hence the act of December created this vacancy, or assumed a falsity and filled one that did not exist.

Counsel for defendants claim other disqualifications of relators, and especially that they have not taken the oath required by the present constitution. This question is not involved in the record. All we can know is that relators were wrongfully turned out, and that defendants hold their places. If reinstated, they acquire no new rights, only such as arise from peaceable possession, claiming.

title, and are subject to any lawful proceeding to test that title. They are still liable to be removed for cause, but it must be by a. direct judicial proceeding, or by a proceeding of a judicial nature, before the board, according to the charter, with the right of full defense, and with the benefit of possession.

We hold, then: first, that the act of February 6, 1847, amending the original act of February 3, 1837, incorporating St. Charles College, inasmuch as it materially changed the mode of choosing curators, and in a manner to endanger the principles of the foundation, was a violation of the contract embraced in the charter, and could not be validated by the subsequent consent of the curators; second, that, although the act of March 23, 1863, providing for taking the management of corporations of a public nature from the hands of those who, during the pending war, were aiding the enemy, was a lawful exercise of legislative power for the public safety in time of war, yet it furnished no warrant for the act of December 11, of the same year, professedly founded upon it; third, that the relators regularly holding their places under claim of right, could not be removed except by judgment at law, or by a proceeding of a judicial nature before the board of curators, according to the charter, with notice and opportunity of defense; that the act of December 11, 1863, so far as it created vacancies, or assumed and filled vacancies not lawfully created, was an exercise of judicial power not belonging to the Legislature; that the vacancies could not be filled by that body until they were created by a lawful removal of relators; and that whatever, in our opinion, in a direct proceeding against them, the judgment might be, or should be, we can not act upon that opinion until such judgment is rendered.

We therefore hold that the relators should be restored to their places, to be held until resignation or removal by some lawful proceeding, and that defendants, having been appointed to fill vacancies that did not exist, are intruders, though without malice, and should be ousted.

The judgment is reversed, and the cause remanded. The other judges concur.