CHARLES M. HITE, TRUSTEE UNDER THE WILL AND OF THE ESTATE OF QUEEN EMMA KALELEONALANI, DECEASED *v.* THE QUEEN'S HOSPITAL, A HAWAIIAN CORPORATION; THE ATTORNEY GENERAL OF THE TERRITORY OF HAWAII, JOSEPH HODGSON; WILLIAM EDWARD CARTWRIGHT AND THE HAWAIIAN TRUST COMPANY, LIMITED, EXECUTORS OF THE WILL OF BRUCE CARTWRIGHT, DECEASED; AND THE PROTESTANT EPISCOPAL CHURCH IN THE HAWAIIAN ISLANDS, OWNER AND OPERATOR OF ST. ANDREW'S PRIORY.

No. 2487.

Argued June 24, 25, 26, 1942.    Decided December 4, 1942.
Submitted June 29, 1942.

Kemp, C. J., Peters and Le Baron, JJ.

OPINION OF THE COURT BY PETERS, J.

This is a bill for instructions brought by the successor trustee under the will and of the estate of Her Late Majesty Queen Emma, Dowager Queen of Kamehameha IV.

Twelve questions calculated to secure the instructions desired were propounded, four of which, *viz.* (7), (9), (11) and (12), the circuit judge declined to answer.

The questions propounded, and the instructions of the court in response thereto, as incorporated in the decree, are hereinafter set forth as occasion for reference arises. Five of the questions answered by the court, *viz.,* questions (1), (3), (4), (6) and (8), were based upon the alleged deviation by The Queen's Hospital from its chartered purposes and included, directly or indirectly, the assumption that the circuit judge in equity, under section 8 of the Indigent Hawaiian Hospital Act of April 20, 1859, or under visitorial powers reserved to the chancellor of the kingdom by the charter of The Queen's Hospital to which it was assumed he as a circuit judge in equity had succeeded, or under his general powers in equity over public charities, had jurisdiction in this proceeding to restrain and correct

the alleged deviation by The Queen's Hospital of a gift, of which it was the donee under the provisions of the trust created by the will of the testatrix, from some of the charitable purposes for which it was organized as a corporation, and should not have been considered in the form presented. But three of the questions answered, *viz.* (2), as amended, (5) and (10), were legitimately directed to the administration of the private trust of which the petitioner was successor trustee. All of the instructions given were adverse to the contentions of the respondents, and they are appellants here. No cross-appeal was taken by the petitioner.

Stripped of nonessentials, a review of the decree of the circuit judge within the specifications of error alleged by appellants involves the solution of the following queries:

1. Where, by the terms of a private testamentary trust, an existing eleemosynary corporation conducting a public charity is the donee of a gift to which no restrictions or limitations upon its use by the donee are attached, is the attorney general a necessary or proper party defendant in a suit in equity brought by the trustee for instructions involving the application of the gift by the donee to certain purposes for which the corporation was organized to the exclusion of others?

2. Is the decree in the matter of the instant trust estate of May 29, 1935, so far as it affects the legacy to St. Andrew's Priory, bequeathed to it by the twelfth item of the will of the testatrix, *res adjudicata*?

3. Does this appeal present for review the instructions given by the circuit judge in response to question number (2), as amended?

The foregoing queries will be considered in their order.

1. Following is the substance of the allegations of the bill as amended pertinent to this inquiry:

Her Late Majesty Queen Emma died on, to wit, April

25, 1885, leaving a last will and testament dated the 21st day of October preceding, which was duly admitted to probate in the circuit court of the first circuit.

By the fourteenth item of her will she devised certain lands to The Queen's Hospital, which proved abortive, it later developing upon litigation that the title was in another. (See *Rooke* v. *Queen's Hospital,* 12 Haw. 375.) By the thirteenth item of her will she devised several other parcels of land to A. J. Cartwright, in trust, to devote the income thereof to the payment of certain annuities and scholarships, the balance to be paid one half to The Queen's Hospital and one half to her cousin, Prince Albert K. Kunuiakea, for life, then to his issue. The trustee was authorized upon the death of the annuitants to sell any one or more of the lands, provided those remaining would produce sufficient income for the scholarships; the proceeds of sale to be divided one half to The Queen's Hospital and the remaining one half to be invested and the income paid to the prince during his life, and upon his death the principal to be paid to the issue of his body. There was a further general power given to the trustee, after the death of all the annuitants, to sell the lands and hold and invest the proceeds upon the trusts stated. By the fifteenth item of her will she devised certain other lands to the trustee upon the trust to pay the income to Prince Albert K. Kunuiakea during his life, and upon his death to convey the same to the issue of his body, and if he should die without issue, then to The Queen's Hospital. The residue of the estate was devised and bequeathed one half to The Queen's Hospital and one half to the trustee, to pay the income thereof to Prince Kunuiakea during his life and at his death to convey the property to his issue, but if the prince should die without lawful issue of his body him surviving, then to The Queen's Hospital, together with all other property devised and bequeathed to the

issue of Prince Kunuiakea. By the sixteenth item of the will, failing lawful issue of Prince Kunuiakea, all bequests and devises in favor of such issue went to The Queen's Hospital.

Prince Kunuiakea died without lawful issue of his body him surviving. From the allegations of the amended bill it may be assumed that all property, real and personal, to which The Queen's Hospital was entitled, either directly or as remainderman, contingent upon Prince Kunuiakea's dying without lawful issue, other than devised and bequeathed under the thirteenth item of the will of the testatrix, has been distributed to it, and the only property of which the successor trustee was seized or possessed at the time of suit was such as was subject to the thirteenth item of the will. This is the item of the will which devised to the trustee certain real estate charged with the payment of the annuities and the scholarships to St. Andrew's Priory. All the annuitants, long prior to suit, were dead. Hence, at the time of suit, the only persons interested in the remaining property, subject to the thirteenth item of the will, now in the possession of the trustee were the St. Andrew's Priory and The Queen's Hospital.

The Queen's Hospital was created a body politic and corporate on June 20, 1859, by the issuance to it by the minister of the interior of the kingdom of Hawaii, by and with the advice and consent of the king in privy council, of a charter of incorporation to His Majesty King Kamehameha IV and twenty trustees, ten of whom were chosen and appointed from their own number, pursuant to a resolution of the contributors and subscribers to a fund for the erection and establishment of a hospital at Honolulu for the relief of indigent, sick and disabled people of the Hawaiian Kingdom, as well as of such foreigners and others as might desire to avail themselves of the same. The other ten trustees, pursuant to the resolution, were

appointed by the king upon the nomination of the minister of the interior. The charter recites the circumstances of the foundation of The Queen's Hospital as follows:

"WHEREAS—it has been made known to me, that a number of persons, resident in Honolulu, and other parts of the Kingdom, have entered into a voluntary contribution, by subscription, for the purpose of creating a fund, for the erection and establishment of a HOSPITAL AT HONOLULU, for the relief of indigent, sick, and disabled people of the Hawaiian Kingdom; as well as of such foreigners, and others, as may desire to avail themselves of the same; AND WHEREAS, at a meeting of the said subscribers, it was, amongst other matters resolved, that they should associate themselves together as a BODY POLITIC AND CORPORATE, for the purpose of carrying into effect, the objects and intentions of the said subscribers: and also, that the said intended Corporation should be known and designated, as 'THE QUEEN'S HOSPITAL', and Their Majesties, the King and Queen, were declared Royal Patrons thereof: and it was further resolved, that a President and a Committee, or Board of Trustees, composed of twenty of the said subscribers, should be chosen, and appointed, as in said resolution mentioned and provided, and as hereinafter contained; which said Board of Trustees, should vacate, and go out of office, at the several times, and in the manner therein provided, and hereinafter expressed, and declared; and provision was also made for supplying successors to such vacating trustees, and their successors, from time to time, and HIS MAJESTY KAMEHAMEHA 4—the Sovereign of this Kingdom, was elected, and declared perpetual President of the said Corporation, by acclamation; and the following ten subscribers were elected by ballot, to act as Trustees, on behalf of the said subscribers, viz: B. F. SNOW, S. C. DAMON, S. N. CASTLE, C. R. BISHOP, J. W. AUSTIN, E. O. HALL,

J. T. WATERHOUSE, W. A. ALDRICH, W. L. GREEN, and H. HACKFIELD, and on the nomination of the Minister of the Interior, His Majesty then designated the following ten persons, Trustees, on behalf of the Government, viz: HIS ROYAL HIGHNESS PRINCE L. KAMEHAMEHA, DAVID L. GREGG, WM. WEBSTER, G. M. ROBERTSON, T. C. HEUCK, JOHN LADD, JAMES BISSETT, H. J. H. HOLDSWORTH, A. B. BATES & JOHN MONTGOMERY.

"Be it known therefore, to all whom it may concern: That in accordance with a Resolution of the King in Privy Council, bearing date the 16th day of June A. D. 1859, and by virtue of the authority in me vested, I have constituted, and by these presents, do constitute, HIS MAJESTY, the Sovereign of the Hawaiian Islands—President, as aforesaid—and also, the said PRINCE L. KAMEHAMEHA, DAVID L. GREGG, WM. WEBSTER, G. M. ROBERTSON, T. C. HEUCK, JOHN LADD, JAMES BISSETT, H. J. H. HOLDSWORTH, A. B. BATES, JOHN MONTGOMERY, B. F. SNOW, S. C. DAMON, S. N. CASTLE, C. R. BISHOP, J. W. AUSTIN, E. O. HALL, J. T. WATERHOUSE, W. A. ALDRICH, W. S. GREEN, and H. HACKFIELD, their *associates* and *successors*, a Body Politic and Corporate, whereof the Sovereign shall be perpetual President, to be known and designated under the name and title of 'The Queen's Hospital'; * * *."

By its charter The Queen's Hospital was expressly authorized "to purchase, or rent, on lease, a suitable site for, and provide for, and proceed with, the erection; furnishing, establishing, and putting into operation, a permanent Hospital at Honolulu, with a Dispensary, and all necessary furniture and appurtenances, for the reception and accommodation, and treatment, of indigent, sick, and disabled, Hawaiians; as well as such foreigners, and others, who may choose to avail themselves of the same; * * * ."

The corporation was also authorized "So soon as the Hospital, contemplated by this Charter, shall be established, the Board of Trustees and their successors, for the time being, from time to time, may contract to receive, and provide for, sick, and invalid seamen of other countries; or patients of any description, who shall be fit subjects for medical, or surgical treatment." The power of amendment of the charter was reserved in the following language: "This Charter, and every future Charter, to be hereafter granted to this Corporation, may be altered, or amended by the Minister of the Interior, for the time being, with the approval of the King, on a requisition of a majority of the Subscribers, present at a general, or special meeting, to be called by the Secretary for that purpose: * * * ."

The charter of The Queen's Hospital was amended from time to time. These amendments are set forth in the bill. They are characterized by the hospital in its brief in this court as follows:

"The amendments of 1878 provided that all bequests made to the corporation shall constitute a permanent fund the income of which only shall be used for the purposes of the Hospital; and that money given for endowed beds shall be invested for the purpose of maintaining such beds, and not used for any other purpose.

"The amended charter granted in 1909 made several changes * * *.

"The purposes of the corporation were stated to be 'to build, establish, furnish, operate and maintain hospitals in Honolulu, and if its funds permit, at other places in the Territory of Hawaii, for the treatment of sick and disabled persons * * *; to maintain wards and apartments for the treatment of pay-patients as well as free wards for the treatment of indigent persons * * * .' Reference to a dispensary was omitted; annual membership in the cor-

poration was abolished, and all subscribers of not less than $50 became life members upon a majority vote of the Trustees; membership of the Board of Trustees was reduced from twenty to seven, and the life presidency was abolished. The Trustees, including the President, to be elected by the membership. The provision for rendering a semiannual report to the Minister of the Interior, and the provision with respect to general supervision by the Chancellor were omitted. Article 12 of the original charter was omitted and in lieu thereof it was provided that the charter and the corporation shall be subject to all laws that might thereafter be enacted not inapplicable to charters or corporations of this character.

"Other changes of a minor character were made.

"The amended charter granted in 1935 changed the title of the Board of Trustees to the Board of Directors, and provided for the appointment of the President by the Directors from among the members of the Board. The amendments made in 1878 with reference to bequests and endowed beds were both omitted * * * .

"Other changes of a minor character were made."

Due to our conclusions subsequently announced, we deem further comment upon the character of the amendments unnecessary.

The petitioner, by the allegations in the amended bill, took the position that The Queen's Hospital was organized as a corporation under and pursuant to the provisions of the Act of the legislature of the kingdom of Hawaii of April 20, 1859, entitled, "An Act to Provide Hospitals for the Relief of Hawaiians in the City of Honolulu and Other Localities,"[1] as amended by the Act of the kingdom of Hawaii of July 5, 1860, entitled, "An Act in Aid of The Queen's Hospital Corporation,"[2] and that the gifts to it

[1] Civil Code 1859, p. 433.
[2] Laws Haw. 1860, p. 26.

under the will of his decedent must be devoted exclusively, or at least primarily, to the reception and accommodation and treatment of indigent, sick and disabled Hawaiians. And upon information and belief alleged that the hospital was then, and for an unascertained time next thereto preceding, had been "diverting the funds received from the estate of Queen Emma for the relief, reception, accommodation and treatment of indigent and sick Hawaiians for general hospital purposes, mainly for the use of patients able to pay and paying for accommodation and treatment in said hospital; and that the only free relief, reception, accommodation and treatment given by said hospital to sick and indigent Hawaiians are those given by virtue of charitable grants made by others than Queen Emma." He also, in his amended bill, made the direct charge "That there are now a large number of Hawaiians throughout the Territory and particularly in the City and County of Honolulu who are indigent, sick and disabled and who cannot now and have not for an unascertained number of years last past been able to receive free treatment, accommodation and relief at The Queen's Hospital under the present rules and regulations and method of operation of said hospital. That said hospital does not now and for an unascertained period of years last past has not maintained a free dispensary for sick, indigent and disabled Hawaiians."

It also appears from the bill as amended that Bruce Cartwright, a predecessor trustee, under and pursuant to the provisions of the thirteenth and sixteenth items of the will of the testatrix, annually paid to The Queen's Hospital income which accrued under both of said items and distributable to said hospital; and under and pursuant to the provisions of item thirteen of the will, in 1935 and in 1938, distributed to the hospital its distributable share of the proceeds of the sale of real estate, and in that regard

the trustee alleges that the then trustee, at the time of the distribution in 1935 of the sum of $190,000, "knew, or could by inquiry have learned, that The Queen's Hospital was not expending the annual income paid to it by said Trustee for the relief, reception, accommodation and treatment of indigent, sick and disabled Hawaiians. That notwithstanding such knowledge or opportunity for such knowledge, and further knowing, or having opportunity to learn, that the income from said $190,000 was not being expended for the relief, reception, accommodation and treatment of sick, indigent and disabled Hawaiians, said Trustee in 1938 made further distribution to said Queen's Hospital of the sum of $58,000 * * * ."

Predicated upon the averments of the amended bill, the trustee propounded the following questions upon the subjects of which he expressed doubt: "(1). Whether The Queen's Hospital is entitled to have distributed to it either the income from the trust estate, after the payment of scholarships to St. Andrew's Priory, or to have distributed to it the corpus of the estate, other than enough to care for said scholarships, in the event of a sale of the real property of said estate. * * * (3). Whether the funds left by Queen Emma to The Queen's Hospital, whether of income or corpus, must be expended solely or at least primarily for the maintenance and medical care of sick, indigent and disabled Hawaiians. (4). Whether the Court of Equity [may] require such funds to be expended for such purpose through The Queen's Hospital or through some other means. (5). Whether the amendments to the Charter of The Queen's Hospital in 1909, in 1922, or in 1935 affected any change in said charter with respect to the requirements of expenditure of Queen Emma's bounty. (6). Whether the provision of the original Charter of The Queen's Hospital requiring the expenditure of funds to be under the eye and supervision of the Chancellor of the

Kingdom requires a like supervision of Queen Emma's bounty by the successor to the Chancellor, and if so, (7). Who the successor of the Chancellor is,—whether the Chief Justice of the Supreme Court or the Attorney General of the Territory of Hawaii or the Judge of the Circuit Court presiding in Equity. (8). Whether The Queen's Hospital may continue to be entrusted with the ultimate expenditure of Queen Emma's bounty in the event that this Court should determine that the object of that bounty was for the relief of sick, indigent and disabled Hawaiians, and that The Queen's Hospital had been derelict in the administration of the trust imposed upon the bounty received. (9). Whether he should institute an adversary suit against The Queen's Hospital (a) to recover the capital sum of $190,000 and of $58,000 distributed to it in 1935 and 1938, respectively, and such other capital sums as may have been distributed to it; or (b) to require the application of said sum, or the buildings and equipment for which it was expended, to be used primarily for the relief of sick, indigent and disabled Hawaiians. * * * (11). Whether the distributions of $190,000 and $58,000 made to The Queen's Hospital in 1935 and 1938, respectively, by Bruce Cartwright (now deceased), Trustee under the Will and of the Estate of Queen Emma, Deceased, constituted such a breach of trust as to render him liable to said estate during his life and his own estate and executors so liable after his death to a surcharge in such amounts."

The attorney general was made a party defendant. He interposed a demurrer, all the grounds of which may be epitomized into two objections, viz., (a) that he was not a necessary or proper party defendant, for the reasons that it did not appear from the bill that the Territory of Hawaii or the attorney general of the Territory had any interest in the subject matter of the bill, and (b) that the bill failed to state any grounds for equitable relief against the Ter-

ritory or its attorney general. The demurrer was overruled by the court. The attorney general in his answer persisted in his objections to being made a party defendant. His objections were overruled upon the merits. . The court's rulings upon demurrer and the merits constituted error.

Apparently the attorney general was made a party defendant upon the theory that a public charity was involved and that he, as legal representative of the Territory, the *parens patriae* of all public charities, had an interest in the subject matter of the suit. Zollman has this to say upon the necessity or propriety of making the attorney general a party to proceedings involving public charities: "In order that the trust may be maintained, it is, therefore, not only the right, but the duty of the state, through its law officers, to take action for their maintenance and enforcement. This duty is exercised in America as in England through the attorney general, who, therefore, is a proper, though he may not be a necessary, party plaintiff or defendant as the representative of the public, and whose duty it is to prevent the breach and to enforce the proper application of a charitable trust, and to compel the restitution of any part thereof which has been diverted to other purposes. The state, through him as *parens patriae,* superintends the management of all public charities, so that a suit brought by him to establish a charity becomes, in truth as well as in form, a suit to protect public interests, and is, in fact, the only method by which the public can make its interest in the charity effective. This practice developed in England under the statute of Elizabeth and obtains in America even in the absence of a statute expressly authorizing it." Zollman, *American Law of Charities* § 613, p. 427. See also citations in margin.[3]

---

3 Daniell's, *Ch. Plead. & Prac.* (6th Am. ed.) p. 137; *Lackland* v. *Walker*, 151 Mo. 210, 52 S. W. 414, 423.

Assuming, but not deciding, that the doctrine of *parens patriae* obtains in this jurisdiction, and that neither by the law of its creation nor by the provisions of its original charter of incorporation was the visitorial power over The Queen's Hospital otherwise provided, in our opinion a public charity was not involved in these proceedings; no legal impediment existed to the execution of the gift made by the thirteenth item of the will of the testatrix to The Queen's Hospital, and it was the plain duty of the successor trustee, petitioner herein, to pay the same to the legatee when distributable to it under the terms of the will.

Neither the existence nor legality of the gift to The Queen's Hospital of the property subject to the thirteenth item of the will, either as legatee or contingent remainderman, are involved in this proceeding. The existence of the *res* and the legality of its disposition are conceded. Moreover, the trust created by the thirteenth paragraph of the will of Queen Emma was a private trust.[4] No charity was thereby created. The beneficiaries were definite and ascertainable. Though the gift was to an eleemosynary corporation it did not create a charitable trust.[5] It was made outright without restrictions or limitations. Hence, no impediment existed, as far as the trust created by the thirteenth item of the will was concerned, to the trustee executing the gift.

The only legal impediments to executing the gift made by the testatrix in favor of The Queen's Hospital, as far as the allegations of the amended bill are concerned, were the alleged diversion by The Queen's Hospital in the past of funds distributed to it under and pursuant to the pro-

---

[4] I Restatement, Trusts § 2, *Comment a.* For distinction between private trust and charitable trust, see II Restatement, Trusts, c. 11, *Introductory Note.*

[5] 2 Bogert, Trusts § 324, p. 1031.

visions of the will of the testatrix and the apprehended future similar diversion if and when received.

The provisions of the will of Queen Emma in favor of The Queen's Hospital are clear and unambiguous, and it is unnecessary to resort to artificial rules of construction to ascertain their meaning. Courts are "not at liberty to indulge in suppositions, surmises or conjectures and override the plain and unambiguous language of this will; to conjure doubt where no ambiguity or obscurity exists or to infer an intention of which the language employed does not admit and then apply rules of construction to give such intention effect." *Estate of Campbell,* 33 Haw. 799, 807. Moreover, the gift to it under the thirteenth item of the will was without limitation or restriction upon its use by The Queen's Hospital. The Queen's Hospital, unquestionably, at the time of the death of the testatrix, was an eleemosynary corporation. This, at least, is conceded by all the parties. Hence, under the authorities, the provisions of the will of the testatrix in its favor were for its general eleemosynary purposes.[6] In the absence of expression showing a contrary intention it must be assumed that the intentions of the testatrix were consistent with the legal effect of the gift as made.

In order to determine, however, whether any legal obstacle existed to the execution by the trustee of the provisions of the will of the testatrix by reason of the alleged conduct of The Queen's Hospital, past or apprehended, it becomes necessary to determine what were its general eleemosynary purposes at the time of the death of the testatrix, and whether the alleged diversion by it of Queen Emma's bounty from the reception and accommodation and treatment of indigent, sick and disabled Hawaiians to general hospital purposes, mainly for the use of patients able to

---

6  3 Scott, Trusts § 348:1; *Lawson's Estate,* 264 Pa. 77, 107 Atl. 376.

pay and paying for accommodation and treatment in said hospital as alleged, constituted a legal obstacle to the execution of the gift in its favor, and the imposition of the coercive remedies and restraints suggested by the questions propounded and ordered by the court. Obviously, had The Queen's Hospital been adjudged a bankrupt, and its property taken over by a trustee,[7] or were it in process of dissolution as a corporation, or had it so prostituted the sacred purposes of its organization that it could be said it was no longer observing or performing the purposes of its existence,[8] it would be the duty of the chancellor to sequester the remainder of the gift and abate its payment or delivery to the hospital, awaiting the correction of abuses, or to *cy pres* the gift. Under such a condition of affairs the attorney general might be not alone a proper but a necessary party defendant. But none of the hypotheses suggested existed, and under the allegations of the amended bill we are confined to the question whether, taking the facts as alleged in the amended bill to be true, it states a case admitting of the interference by a court of equity, upon a bill of instructions by the successor trustee of a private testamentary trust, with the execution of a gift made by the testatrix to an eleemosynary corporation, upon the ground of past and apprehended misapplication by the donee of installments of the gift to some of the purposes of its organization to the exclusion of others.

In our opinion, neither for the purposes of the demurrer nor the merits was the identity of the statutory law, under and pursuant to which The Queen's Hospital was organized, material to the issues. The bill of complaint conceded that The Queen's Hospital was a corporation *de jure*. No claim was made that the purposes for

---

[7] *In re Walter's Estate*, 269 N. Y. Supp. 400.

[8] *MacKenzie* v. *Trustees of Presbytery of Jersey City*, 67 N. J. Eq. 652, 61 Atl. 1027.

which it was originally organized were unlawful or contrary to public policy. As between the trustee of the trust created by the will of Queen Emma, on the one hand, and The Queen's Hospital, an eleemosynary corporation, on the other, the court in these proceedings was alone concerned with the purposes for which The Queen's Hospital was incorporated as declared by its charter.

As originally declared by its charter, the fundamental purpose for its organization was the establishment of a permanent hospital at Honolulu, with a dispensary, for the reception, accommodation and treatment of indigent, sick and disabled Hawaiians, as well as such foreigners and others who might choose to avail themselves of the same. The exact language of the charter has been hereinbefore quoted. It is true that it was also granted power to contract or receive and provide for sick and invalid seamen of other countries, or patients of any description who should be fit subjects for medical or surgical treatment. But the powers granted under the charter should not be confused with the purposes for which it was organized.

Obviously, whether we consider the purposes of its organization alone or in conjunction with the powers granted, the language employed does not admit of the construction that the hospital and dispensary, when established, were to be devoted exclusively or primarily to indigent Hawaiians. To foreigners and others who might choose to avail themselves of its facilities, the hospital and dispensary were equally open. No more so does the language referred to admit of the construction that none but indigent Hawaiians could avail themselves of the hospital or dispensary, when established, if they chose to do so. The language employed, defining the fundamental purpose of the organization of The Queen's Hospital, is too broad and comprehensive to be limited to indigent Hawaiians

and such foreigners and others who were able to pay. Not alone were indigent Hawaiians the subject of its charity, but foreigners and others who might choose to avail themselves of the same.

Nor does the power granted to the hospital to "contract" limit in any degree the import of the terms employed to describe the purposes to which the hospital and dispensary, when established, were to be devoted. The trial judge held that The Queen's Hospital was organized under and pursuant to the provisions of the Indigent Hawaiian Hospital Act of April 20, 1859, read into the charter the provisions of section 7 of the Act,[9] and construed the language of that section, "as soon as the same may be done, without interfering with the primary object of said institution," as limiting the foreigners and others who might choose to avail themselves of the same to pay-patients of that description. But the language of section 7 of the Act last quoted is not included in the charter of incorporation. On the contrary, while the description of the class in respect of which it might contract is adopted, the limitation upon its right to contract imposed by section 7 of the Hospital Act was apparently rejected. The charter of incorporation does not limit its powers to contract in any way. It might become important as between the Territory and a hospital which claimed privileges extended hospitals organized under and pursuant to the Hospital Act of April 20, 1859, whether it had contracted for the care of patients to the detriment of indigent Hawaiians. This court considered the legal effect of the limitation contained in section 7 of the Act of April 20, 1859, in a case

---

9 "Section 7. Such Corporation may, as soon as the same may be done, without interfering with the primary object of said institution, as herein before expressed, contract to receive and provide for sick and disabled seamen of other countries, or patients of any description who are fit subjects for hospital treatment."

where the auditor of the Territory denied the right of The Queen's Hospital to a legislative appropriation in its favor upon the ground that it was not for a public purpose, holding that if the contention were correct that The Queen's Hospital had been organized under and pursuant to the provisions of the Hospital Act, section 7 thereof did not detract from its general purposes as a public hospital as declared by its charter, where it appeared that the hospital had, ever since its establishment, extended its aid to all indigent sick alike and that, so far as appears, without interfering with its primary object. (*In re Queen's Hospital,* 15 Haw. 663.) But that is not this case. We are here alone concerned with the question of the charter purposes of The Queen's Hospital in respect to a testamentary gift made without limitation or restriction upon its use by the donee.

Nor should the meaning of the word "contract" as employed in the charter be confused by including the concept of profit. A contract for hospitalization might be at a rate below the cost of service; it might be at a rate so negligible in comparison with the services to be rendered as to be practically free and yet be a subject of "contract."

Concluding as we do that, under its charter of incorporation as originally granted, the permanent hospital and dispensary to be established by The Queen's Hospital were for the use alike of indigent Hawaiians and such foreigners and others who might choose to avail themselves of the same, we may now proceed to the question of whether the gift made by the testatrix was for the general purposes of The Queen's Hospital as originally organized or as they existed in amended form, and, in either case, whether any legal obstacle existed preventing the payment or delivery of the gift made in favor of The Queen's Hospital immediately upon it becoming distributable to it, in whole or in part, under the terms of the will of the testatrix.

The several amendments made by The Queen's Hospital of its charter of incorporation depend for their validity upon the reserved power of amendment contained in the original charter, the express powers[10] of the proper administrative and executive officers of the government for the time being authorized to approve such amendments, and the legislative confirmation[11] of all amendments made by corporations of their articles of association or charters prior to March 14, 1919. Assuming, but not deciding, that the statutory power of approval of amendments and the legislative sanction of amendments, heretofore referred to, apply to charters granted to eleemosynary corporations similarly as to those organized for agricultural, commercial and manufacturing purposes, we are of the opinion that the power of amendment of charters of corporations administering public charities organized similarly as The Queen's Hospital is governed by the general substantive rules of law concerning public charities, and that the original purposes of the founders of a corporation so organized may not be varied except upon the judicial approval of a court of equity exercising jurisdiction over charities, if and when such jurisdiction is invoked by the proper party in a proper case. The same may be said of the legislative sanction of amendments of charters of public charities organized similarly as The Queen's Hospital.

The bases of our conclusions upon this aspect of the case are the political status of The Queen's Hospital as a private corporation, and the public character of the charity for which it was organized.

Fundamentally, all corporations are either public or

---

10 Laws Rep. Haw. 1894-5, Act 13, § 1; Civil Laws 1897, § 2043; Sess. Laws 1919, Act 13, pt. of § 1; Sess. Laws 1921, Act 188, § 1; Sess. Laws 1923, Act 133, § 2; R. L. H. 1925, § 3343; Sess. Laws 1929, Act 122, § 1; R. L. H. 1935, § 6723.

11 Laws Rep. Haw. 1894-5, Act 13, § 2; Civil Laws 1897, § 2044; Sess. Laws 1919, Act 13, pt. of § 1; R. L. H. 1925, § 3344; R. L. H. 1935, § 6724.

private.[12]  Corporations are usually divided into three classes, namely, public, quasi-public or private.[13]

With the term "public corporations" are usually associated corporations organized to administer portions of the powers of the State and those whose assets are owned by the government.  A hospital under the control of the government of the State, and created and acting as an agency of the State for the relief of the indigent sick, is a public corporation.[14]  Such hospitals are created "to discharge a * * * governmental function, pertaining to the care and treatment of unfortunate members of the community, and exist for governmental purposes solely.  They are strictly public institutions, whose maintenance is provided for by legislative appropriations on the part of the state, whose trustees or managers are appointed by the governor, and are, in fact, public officials, whose duties are fixed by express provisions of law, and whose conduct and management is under the exclusive control of the state.  They are entirely distinct from either private or municipal corporations, constitute purely public corporations acting as agencies of the state for governmental purposes exclusively.  They need not have been created as corporations at all, and their creation as such, and endowment with corporate powers, was in order that the duties imposed upon the official thereof and the administration of such institutions might be discharged more conveniently and effectually."

Quasi-public corporations, though technically private, may be of a quasi-public character due to the public interest in the enterprise for which the corporation is organ-

---

12 *Phillips* vs. *Baltimore City*, 110 Md. 431, 72 Atl. 902, 905.

13 1 McQuillin, *Munic. Corp.* § 125, p. 368; 1 Cook, Corp. § 7, p. 41; Morawetz, *Private Corp.* (2d ed.) § 3; *State* v. *Carr*, 12 N. E. 318 (Ind.).

14 *Napa State Hospital* v. *Dasso*, 153 Cal. 698, 96 Pac. 355, 357.

ized.[15] Familiar examples of quasi-public corporations are corporate public utilities. Private corporations are usually classified as aggregate or sole, with reference to the number of persons composing them, ecclesiastical or lay, in relation to the purposes for which they are created,[16] the latter class including two sorts, civil and eleemosynary[17] or charitable.[18] A private corporation organized for public charity may, in contemplation of law, be considered a quasi-public corporation where the charter of incorporation contains provisions of a purely public character, introduced solely for the public good and as a general police regulation of the State.[19]

None of the purposes for which The Queen's Hospital was organized included the administration of powers of the sovereign, nor were its assets owned by the sovereign. It was not created to discharge a governmental function pertaining to the care and treatment of the sick of the community, or solely for governmental purposes. No agency existed between it and the sovereign of its creation. On the contrary it was endowed by private, benevolently-inclined persons, and the fund subscribed and contributed by them was the financial nucleus of its establishment. The property of the hospital is private property. It was vested in the trustees by the charter to be administered by them according to the will of the founders and donors as expressed in the charter. It is true that The Queen's Hospital received substantial financial assistance from the

---

[15] 1 McQuillin, *Munic. Corp.* § 125, p. 368, cited *supra* note 13.

[16] *Ibid.*; 1 Cook, Corp. § 7, p. 41; and *State* v. *Carr*, 12 N. E. 318 (Ind.), all cited *supra* note 13.

[17] *Cohen* v. *General Hospital Society*, 113 Conn. 188, 154 Atl. 435; *Dartmouth College* v. *Woodward*, 4 Wheat. 518 .(U.S.); *Finan* v. *M. & C. C. of Cumberland*, 154 Md. 563, 141 Atl. 269.

[18] *Estate of Wirt*, 263 Pac. 271 (Cal. App.), 207 Cal. 106, 277 Pac. 118.

[19] *University of Md.* vs. *Williams*, 9 Gill & J. 365, 31 Am. Dec. 72, 86; *The City of Indianapolis* v. *The Indianapolis Home for Friendless Women*, 50 Ind. 215, 220.

kingdom of Hawaii and its political successors from the time of its organization until the establishment of county government. But a corporation is not a public corporation merely because the institution founded by it is supported in part by donations of land or money from the government.[20] The creation of The Queen's Hospital and the creation of Dartmouth College, the political status of which as a private corporation was a subject of inquiry in the celebrated case of *Dartmouth College* v. *Woodward,* cited *supra* note 17, factually are very similar. Both were founded by private individuals and attained corporate existence at the instance of the founders by charter from the sovereign incorporating its trustees, in whom were vested the fund contributed for the foundation of the charity as a "body politic and corporate." And the tests adopted and applied by the different members of the court in the *Dartmouth College* case are equally decisive in this case. Three members of the court, including Mr. Chief Justice Marshall and Mr. Justice Story, wrote separate opinions. Brevity prohibits extensive quotation. It will suffice to summarize the factual and legal principles emphasized in the opinions of the two justices referred to, quoting only where to do otherwise would result in mutilation. From the opinion of the chief justice they were: The funds of the corporation consisted entirely of private donations; these funds were obtained by the original founder, Dr. Wheelock, "in trust, to be applied by him to the purposes" of the charity. The charter of incorporation was granted at the instance of Dr. Wheelock; the college was "endowed by private individuals." In answer to the questions, "Do its objects stamp on it a different character [*i.e.,* a public and not a private corporation]?

---

20 *Trustees for Vincennes University* v. *State of Indiana,* 14 How. 268 (U.S.); *Allen* v. *McKean,* 1 Fed. Cas. No. 229; *Cleveland* vs. *Stewart and others,* 3 Ga. 283, 291, and cases cited.

Are the trustees and professors public officers, invested with any portion of political power, partaking in any degree in the administration of civil government * * *?" (p. 632), the reply was made, "Not from the source whence its funds were drawn; for its foundation is purely private and eleemosynary—not from the application of those funds; for money may be given for education, and the persons receiving it do not, by being employed in the education of youth, become members of the civil government." Continuing on this same subject, to the question "Is it from the act of incorporation?", the reply was made, "A corporation is an artificial being, invisible, intangible, and existing only in contemplation of law. Being the mere creature of law, it possesses only those properties which the charter of its creation confers upon it, either expressly, or as incidental to its very existence. These are such as are supposed best calculated to effect the object for which it was created. Among the most important are immortality, * * *; properties, by which a perpetual succession of many persons are considered as the same, and may act as a single individual. * * * But this being does not share in the civil government of the country, unless that be the purpose for which it was created. Its immortality no more confers on it political power, or a political character, than immortality would confer such power or character on a natural person. It is no more a state instrument, than a natural person exercising the same powers would be." (pp. 634, 636.) To the final questions "If, then, a natural person, employed by individuals in the education of youth, or for the government of a seminary in which youth is educated, would not become a public officer, or be considered as a member of the civil government, how is it, that this artificial being, created by law, for the purpose of being employed by the same individuals, for the same purposes, should become a part of the civil government of

the country? Is it because its existence, its capacities, its powers, are given by law?" the following rejoinder was made: "The objects for which a corporation is created are universally such as the government wishes to promote. They are deemed beneficial to the country; and this benefit constitutes the consideration, and in most cases, the sole consideration of the grant. In most eleemosynary institutions, the object would be difficult, perhaps unattainable, without the aid of a charter of incorporation. Charitable or public-spirited individuals, desirous of making permanent appropriations for charitable or other useful purposes, find it impossible to effect their design securely and certainly, without an incorporating act. * * * From the fact, then, that a charter of incorporation has been granted, nothing can be inferred, which changes the character of the institution, or transfers to the government any new power over it. The character of civil institutions does not grow out of their incorporation, but out of the manner in which they are formed, and the objects for which they are created. The right to change them is not founded on their being incorporated, but on their being the instruments of government, created for its purposes. The same institutions, created for the same objects, though not incorporated, would be public institutions, and, of course, be controllable by the legislature. The incorporating act neither gives nor prevents this control. Neither, in reason, can the incorporating act change the character of a private eleemosynary institution. * * * (p. 636.) From this review of the charter, it appears, that Dartmouth College is an eleemosynary institution, incorporated for the purpose of perpetuating the application of the bounty of the donors, to the specified objects of that bounty; that its trustees or governors were originally named by the founder, and invested with the power of perpetuating themselves; that they are not public officers, nor is it a

civil institution, participating in the administration of government; but a charity school, or a seminary of education, incorporated for the preservation of its property, and the perpetual application of that property to the objects of its creation." (p. 639.) From the opinion of Mr. Justice Story they were: The definition of corporations aggregate at common law; the division of lay corporations into civil and eleemosynary. The definition of eleemosynary corporations: "Eleemosynary corporations are such as are constituted for the perpetual distribution of the free-alms and bounty of the founder, in such manner as he has directed; and in this class, are ranked hospitals for the relief of poor and impotent persons * * * ." The division of corporations into public and private; public corporations "are such only as are founded by the government, for public purposes, where the whole interests belong also to the government. If, therefore, the foundation be private, though under the charter of the government, the corporation is private, however extensive the uses may be to which it is devoted, either by the bounty of the founder, or the nature and objects of the institution." Classified as public corporations: A bank created by the government for its own use, whose stock is exclusively owned by the government; and hospitals created and endowed by the government for public charity. "An hospital, founded by a private benefactor, is, in point of law, a private corporation, although dedicated by its charter to general charity." In rejoinder to the supposition indulged in upon argument that "if the uses of an eleemosynary corporation be for general charity, this alone would constitute it a public corporation," the following reply was made: "But the law is certainly not so. To be sure, in a certain sense, every charity, which is extensive in its reach, may be called a public charity, in contradistinction to a charity embracing but a few definite objects. * * *

(p. 668.) When, then, the argument assumes, that because the charity is public, the corporation is public, it manifestly confounds the popular, with the strictly legal, sense of the terms. * * * When the corporation is said, at the bar, to be public, it is not merely meant, that the whole community may be the proper objects of the bounty, but that the government have the sole right, as trustees of the public interests, to regulate, control and direct the corporation, and its funds and its franchises, at its own good will and pleasure. Now, such an authority does not exist in the government, except where the corporation, is in the strictest sense, public; that is, where its whole interests and franchises are the exclusive property and domain of the government itself." (p. 670.)

(See also *Society for the Propagation of the Gospel* v. *New Haven,* 8 Wheat. 464 (U.S.) ; *Trustees for Vincennes University* v. *State of Indiana,* and *Allen* v. *McKean,* both cited *supra* note 20; *University of Md.* vs. *Williams,* cited *supra* note 19; 11 C. J. tit. Charities § 79.)

Nor does the fact that by its charter it was denominated a "body politic and corporate"; that ten of the original trustees were the appointees of the king upon the nomination of the minister of the interior, nor that the charter provides, in substance, that at all times ten of the trustees should be the appointees of the minister of the interior; that the board of trustees render a semiannual report to the minister of the interior of its proceedings, and a statement of the finances and other affairs of the corporation, and publish the same in the several newspapers published at the time in Honolulu; nor that the chancellor of the Hawaiian Islands was granted visitorial powers over the corporation, without appeal, militate against this conclusion. The term "body politic and corporate" has no exclusive legal significance. It has been applied indiscriminately to private as well as public cor-

porations. It is a term uniformly applied to corporations founded similarly as The Queen's Hospital. But whether a corporation organized for a public charity is in a political sense public or private depends not upon the name applied to it but upon the legal effect of its foundation and the objects and purposes of its creation as reflected by its charter. The ten trustees appointed by the crown upon the nomination of the minister of the interior were not officers of the government, nor did they, by virtue of their appointment, become such. No provisions of law existed providing for their appointment or defining their duties. The same may be said of the trustees subsequently appointed by the minister of the interior. By virtue of their appointment they became the joint supervisory officers of the corporation and, as such, the agents of the corporation and not the agents of the government.

The reasons motivating the delegation of the management and control of the hospital to a board of trustees, one half of whom were elected by the members of the corporation and one half by the government, and the requirement of reports and the publication thereof, are obvious. They were primarily police measures. The charity for which the corporation was organized could not be successfully maintained without governmental assistance, as well as private. Publicity encourages private donations. Both private donors and the government, if it became a contributor (and its subsequent actions indicate that it so intended), were entitled to be informed of the uses to which donations and legislative appropriations were put by the donee.

The visitorial power conferred by the charter upon the chancellor of the kingdom, in our opinion, whatever its extent, indicates, if anything, that the subject of its exercise was not a public corporation, which ordinarily would be subject to the visitation of the proper officers of the

government according to law, but a private corporation, the visitation over which required special provision. That The Queen's Hospital is a private corporation does not admit of doubt.

The charity for which The Queen's Hospital was originally organized was unquestionably a public charity. This court so held in the case of *In re Queen's Hospital,* 15 Haw. 663, where the purposes for which The Queen's Hospital as originally organized were under consideration. And while we do not believe, which the opinion of the court seems to imply, that indigency of the unidentified class benefited by the establishment of a hospital by a non-profit private corporation is the sole test of what is a public charity, we see no reason to depart from the conclusions previously reached by the court in that case.

A corporation is not a public corporation merely because it was founded for a public charity or holds a charter from the sovereign.[21]

The power of amendment reserved in the charter of The Queen's Hospital referred only, and could only refer, to such amendments as would not substantially change the scheme of the founders. Otherwise, the power to amend the charter of incorporation of a public charity conducted by a private corporation would include the power to vary the scheme of the founders at will, the only deterrent to which would be the requisite approval of the administrative and executive officers in whom the power of approval of amendments of charters of incorporation reposed by law. To the criticism that such a situation is antisocial, there is the rejoinder that it is no more so than the rule obtaining in the case of ordinary public charitable trusts. The benefit of judicial control is as apparent in one case

---

21 *Dartmouth College* v. *Woodward,* 4 Wheat. 518 (U.S.) cited *supra* note 17; *Society for the Propagation of the Gospel* v. *New Haven, supra;* 11 C. J. tit. Charities § 79, p. 364.

as the other. The mere fact that a public charity is administered in corporate form is not sufficient reason to depart from the salutary rules of law requiring that trustees may not deviate from the purposes prescribed in a public charitable trust except upon the prior approval of a court of equity exercising jurisdiction over public charities.[22]

Moreover, to the courts of equity and not to the legislature is committed the control of public charities conducted by private corporations.

At common law courts of equity exercised a supervisory control over public charities. By the provisions of the Revised Laws of Hawaii 1935, section 4701, paragraph 16, similar jurisdiction was conferred upon circuit judges at chambers, including the jurisdiction to *cy pres* the assets of a public charity.[23] The doctrine of *cy pres* applies to corporations conducting public charities as well as to individual trustees. (II Restatement, Trusts § 399.)

We have made no effort to determine whether the amendments to the charter of The Queen's Hospital, enumerated and recited in the amended bill of complaint, did make any substantial changes in the purposes for which it was founded. If so, we express no opinion on the subject. To the extent that they may deviate from the original purposes for which it was organized, they, in our opinion, are *ultra vires* and void. In contemplation of law, the purposes of The Queen's Hospital were the same when Queen Emma died as when declared in the original charter of incorporation, and must remain the same until altered or changed by competent judicial authority.

The power of the members of a corporation conducting a public charity, with the approval of the proper adminis-

---

22 3 Scott, Trusts § 348:1.

23 *Jackson* v. *Phillips & others*, 14 Allen 539 (Mass.).

trative officer of the domestic State, to amend its charter or articles of incorporation has had the attention of courts of last resort elsewhere and, although divergent in their approach to the subject, their conclusions are similar and coincide with ours.

One approach is the contract doctrine adopted in the *Dartmouth College* case, cited *supra* notes 17 and 21, followed by the cases of *State ex rel. Pittman et al.* v. *Adams et al.*, 44 Mo. 570; *Trustees for Vincennes University* v. *State of Indiana* and *Allen* v. *McKean,* both cited *supra* note 20; and *University of Md.* vs. *Williams,* cited *supra* note 19. In both the *Dartmouth College* and *Pittman* cases the original contributors to the charitable fund secured the trustees, in whom the same was vested, to be incorporated as a body politic and corporate by the issuance to such trustees of a charter of incorporation, reciting its charitable purposes in the same words as those for which the fund had been originally contributed. In both cases the court held that the corporation thus formed was a private corporation; that the contributions for the endowment of the institutions established thereunder on the faith of the charter constituted a contract between the original contributors and the incorporators, and that any substantial change in the charter, change in the unidentified class benefited, or in the mode of expending its funds, or in the objects of the charity, impaired the obligation of the contract.

Another approach is the charitable trust doctrine where, upon analogy to an ordinary charitable trust, the provisions of the charter are considered inviolate and may not be deviated from without the approval of the appropriate court in equity having jurisdiction over charitable trusts. Of the cases hereinafter cited, the best example of the application of the trust doctrine is that of *Osteopathic Hospital* v. *Johnson,* 290 Mich. 283, 287 N. W. 466,

471. In that case the hospital corporation was organized similarly as The Queen's Hospital, and in speaking of the power to amend its articles of association and by-laws adopted pursuant to and in accordance with the original articles of incorporation, the court said: "There is no doubt that he and the other donors intended that the use of the property and the contemplated activity of this corporation should be purely eleemosynary and a contribution to the general welfare of the community, and that it should be carried on in a manner not inconsistent with the articles of association and the original by-laws. * * * the original set-up is so clearly a fundamental element of the plan of the original founders of this trust that it should be protected and preserved by equity. Especially is this true since jurisdiction over the control and execution of trusts is in general vested in the equity courts. (Citing cases.) A material change in this provision of the by-laws should be and is perpetually enjoined; and also for the reasons hereinbefore noted defendants' attempted amendment of article V of the articles of association which would materially change the control and execution of this trust, should be and is held to be invalid * * * ." See also *Healy* v. *Loomis Institute,* 102 Conn. 410; 128 Atl. 774; *Bailey* v. *People,* 79 Colo. 386, 246 Pac. 205, 206; *Lawson's Est.,* cited *supra* note 6; *Magill* v. *Brown,* 16 Fed. Cas. No. 8952; *Jeanes's Estate,* 14 Pa. Co. Ct. 617, 619; *Printing House* v. *Trustees,* 104 U. S. 711; *Carson v. Carson,* 115 Tenn. 37, 88 S. W. 175, 178; *American Bible Society* v. *American Tract Society,* 62 N. J. Eq. 219, 50 Atl. 67, 68.

Personally, while not unfavorable to the application of the contract doctrine, we prefer to base our conclusion upon the charitable trust doctrine. We are not unmindful of the uniformly accepted rule that a gift to a corporation organized as a public charity does not create a trust. But the relation that the corporation bears to the

unidentified class of beneficiaries for which it holds its funds possesses sufficient trust elements to place the corporation, in respect to its administration of the charity, in the same position as individual trustees administering a similar public charity. The analogy between a trust creating a public charity, the administration of which is committed to individual trustees, and a corporation formed by the founders of a public charity embodying the purposes for which the original contributions were made, where the power to alter or amend such purposes is involved, is, in our opinion, complete. The jurisdiction of courts of equity over public charities is not restricted to such, the administration of which is committed to individual trustees, but includes corporations as well. Moreover, to alter or amend the purposes of a public charity necessarily involves the application of the doctrine of *cy pres*. Only courts of equity may apply this doctrine to public charities, and this power is not limited to public charities the administration of which has been committed to individual trustees, but also includes corporations administering public charities. (II Restatement, Trusts § 399.)

It may be assumed *arguendo,* for the purposes of this case, that the allegations of the amended complaint make out a case of deviation by The Queen's Hospital from the purposes for which it was originally organized. But while under the rules of pleading the allegations of the complaint are, upon demurrer, taken as true, equally applicable is the rule of pleading that a complaint upon demurrer is open to all the implications adverse to the pleader of which its allegations are fairly capable.

The allegations of the amended bill are fairly subject to the implication that the funds of The Queen's Hospital were, at the time of suit, being used by it for at least some of the purposes for which it was originally chartered, *i.e.,* the maintenance of a permanent hospital in Honolulu for

the reception, accommodation and treatment of such foreigners and others as might choose to avail themselves of the same. To that extent at least The Queen's Hospital was functioning. It, therefore, cannot be said that the purposes for which it was originally organized had wholly failed or could not possibly be executed. It appearing that neither the existence nor the legality of the gift is involved in these proceedings, and that the donee of the gift was functioning and observing some, if not all, of the purposes for which it was organized, no legal impediment existed to the payment of the gift,[24] and the attorney general was therefore not a proper party defendant.

Moreover, the petitioner, as successor trustee of a private testamentary trust, had no interest in the application of the gift by the donee. It is not expressly alleged in the amended bill of complaint that Queen Emma was one of the original contributors to the fund that formed the nucleus of the charity created by the charter granted to The Queen's Hospital. No doubt she was a substantial contributor. But assuming that the allegations of the amended bill are subject to the inference that she was one of the original contributors and, assuming further that, as such, she possessed a joint power of visitation of the charity to be established by the fund, she ceased to possess such power upon the formation of the corporation.[25] Hence, the petitioner as the legal representative of the trust estate of Queen Emma possessed no greater interest in the administration by The Queen's Hospital of its internal affairs than possessed by the public generally. And to the extent that the amended bill included allegations impugning the conduct by The Queen's Hospital of the public charity for which it was organized, the same was multifarious.

---

[24] *MacKenzie* v. *Trustees of Presbytery of Jersey City*, 67 N. J. Eq. 652, 61 Atl. 1027, cited *supra* note 8, at 1038.

[25] *Trustees of Union Baptist Ass'n.* v. *Huhn*, 26 S. W. 755 (Tex.).

We, therefore, conclude that where a testamentary gift is made to a corporation conducting a public charity without limitation or restriction as to its use, it is not within the province of the legal representative of the estate of the donor to see to its application, but on the contrary it is his clear duty to pay the same to the donee.

A similar situation arose in the case of *MacKenzie* v. *Trustees of Presbytery of Jersey City*, cited *supra* notes 8 and 24. One MacKenzie, in his lifetime, made two deeds of gift to the Scotch Presbyterian Church of Jersey City, a corporation, subject to certain conditions, the details of which are not necessary to our consideration except the one condition that the church organization should be under the care of the Presbytery of Jersey City, and that in the event of sale of the premises at any time the proceeds thereof should be devoted to the same religious purposes by the same organization and upon like conditions. The grantor subsequently died leaving a will, whereby he gave a part of his estate to his executors upon certain trusts, and the residue to the parties complainant. The trustees of the Scotch Presbyterian Church conveyed the premises, the subjects of two gifts to them, to the trustees of the Presbytery of Jersey City, a corporation, and the trustees of the Presbytery of Jersey City, in turn, entered into a contract with the trustees of the Evangelical Lutheran Church of the Holy Trinity of Jersey City, also a corporation, for the sale to them of the said premises. By resolution, the trustees of the Presbytery of Jersey City resolved to use the proceeds of sale for what was declared by the court not in exact accord with the conditions of the original gifts. The complainants, consisting of the devisees and heirs at law of MacKenzie and the executors and trustees named in his will, while the trusts created by the will were not yet fully performed, brought suit against the trustees of the Presbytery of Jersey City, seeking to re-

strain them from making use of the proceeds of sale as re-
solved by them and from in any other way diverting such
proceeds from the uses to which they were limited and the
conditions of the said deeds from their testator.   One of
the assignments of error was that complainants had no
standing in court to prosecute their suit; that they had
no reversion and were not beneficiaries.   The court held:

"It is suggested that these complainants may have some
standing by right of a reverter for a breach of the trust.
To this it is enough to say that, although lands may revert
to an owner or his heirs by reason of a breach of a condi-
tion, no such result flows from the violation of a trust.
* * * Is it to be said that the complainants have a stand-
ing in court as possible beneficiaries having some right,
not as created by a breach of trust, but as existing from
the time of the original donation, although dormant?   It
is obvious that no relief can be accorded to the complain-
ants on this theory.   The bill does not pray any declara-
tion of their personal rights or any relief appropriate
thereto, the proofs do not show that the charity has wholly
failed or cannot possibly be executed, * * *.

"Lastly, it is urged that the complainants have a stand-
ing in court as visitors. * * *  (p. 1038.)

"When charity rests upon a private endowment, the
founder and his heirs become, by the donation, * * * the
legal visitors.   Nevertheless, the founder may delegate his
power of visitation, either generally or specially, and no
technical or precise form of words is necessary for the ap-
pointment of either a general or special visitor. * * * In
Dartmouth College v. Woodward (1819), 17 U. S. 518,
694, * * * Justice Story, citing English cases, declared
that it is sufficient if, from the nature of the duties to be
performed, it can be inferred that the founder intended to
part with the right of visitation, and that, when the ap-
pointment is made in general terms, the whole power of

visitation vests in the appointee. * * * Furthermore, when the founder has thus appointed a general visitor, and for some cause the latter's functions shall have been suspended, as, for example, when rights and powers shall have so centered in one person that the rule that the same person cannot be both visitor and visited shall come into play, the power of visitation does not, ipso facto, return to the founder or his heirs, but is exercised through the courts of the land, properly invoked. * * * In Sanderson v. White (1836) 35 Mass. 328, 339, * * * Chief Justice Shaw said that the trustees of a charitable trust are within the superintending power of a court of equity, not as of itself possessing visitatorial power, but as possessing a general jurisdiction over trusts, and that in such cases the interest of the public, or, what is the same thing, of the general and indefinite objects of the charity, would be represented by the Attorney General. * * *"  (p. 1039.)

An instructive case upon this subject is that of *Dillaway* v. *Burton*, 256 Mass. 568. One Robert B. Brigham, by his will, provided for the establishment of a charitable corporation, and bequeathed and devised to trustees all the rest and residue of his estate for the purposes of the corporation to be formed. Pursuant to the provisions of his will a corporation was formed under the name of the Robert B. Brigham Hospital for Incurables for the purposes prescribed by the will of its founder. Subsequently, Miss Brigham, his sister, by her will, created a trust in which she directed that all the rest, residue and remainder of the net income of her estate be paid to said hospital for the uses and purposes of the same forever. Plaintiff, as one of the trustees under the will of Miss Brigham, and also as a member of the hospital, brought suit against his cotrustees, the three trustees under the will of Robert B. Brigham, the hospital, a physician who was claimed to have been responsible for the acts of the hospital com-

plained of, and the attorney general, to restrain the hospital from the continued deviation from the terms of the will of the founder. The bill alleged that all the facts recited therein had been presented to the attorney general, who had been requested to intervene and make application to the court for the relief of the alleged mismanagement and abuses set forth in the bill, but that the attorney general declined to comply with the request. The petitioner also prayed the instructions of the court whether he should pay over or permit the payment of the income of the trust to the hospital corporation while it used the said income or any of its funds for purposes other than those described in the will of the founder or the will of his deceased testatrix. The defendants severally demurred to the bill upon the grounds (1) that it was multifarious, (2) want of equity, and (3) that the plaintiff had no interest or standing to maintain it, either as trustee under the will of Elizabeth F. Brigham or as a member of the hospital corporation. The objection that the bill was multifarious was sustained. In ruling upon the objection that the plaintiff had no interest or standing to maintain the bill, the court said: "The plaintiff and his cotrustees under the will of Elizabeth F. Brigham are trustees of a charitable trust, and it is their duty to pay over to the hospital corporation the income which they receive in accordance with the terms of the will. When the income has been so paid their duties in connection therewith are at an end. The plaintiff has no interest in the trust fund after it has been paid to the hospital, other than that of the general public. * * * in the case at bar the plaintiff is not a visitor, and is without any visitorial powers as trustee under the will of Elizabeth F. Brigham. The charity was created by the will of Robert B. Brigham, who granted full visitorial powers to the trustees of the hospital corporation. Elizabeth F. Brigham, from whose will the plaintiff de-

rives his standing, did not found the hospital; she merely contributed to it. The plaintiff as a member of the corporate defendant has no standing to maintain the bill; he and his fellow members are represented by the corporation. The issues raised by the bill do not involve his private interests as a member of the corporation, but pertain to matters in which only the public interest represented by the Attorney General is directly concerned." (See also *In re Grossman's Will*, 227 N. Y. S. 470, 480.)

Having determined that the attorney general was neither a necessary nor a proper party defendant, and that the petitioner had no interest in the application of the gift when and if received by the donee, the subject of the power of visitation over The Queen's Hospital as a public charity is necessarily concluded. If and when appropriate proceedings are instituted to correct the alleged abuses of which The Queen's Hospital has been indicted in these proceedings, the question of interest of the party complainant may then become a proper subject of inquiry. But that question does not arise here. It is not a proper subject of instructions in this proceeding, and the circuit judge should have declined to answer question number (6) as well as question number (7).

Pursuant to the views heretofore expressed, the decree of the circuit judge at chambers is reversed so far as it retained the attorney general as a party defendant, and to the extent that its instructions are responsive to questions (1), (3), (4), (6) and (8), the same are vacated and set aside. If that portion of the court's instructions given in answer to question (1), "that no part of the principal of the trust be distributed to said Hospital during the life of the trust, there being no more income than is necessary to pay the Six Hundred Dollars per annum to the St. Andrew's Priory," may be considered as responsive to the question and not limited by what preceded, the same is

also reversed, it being contrary to the plainly expressed provisions of the thirteenth item of the will reposing in the trustee the power, upon the death of the annuitants, to sell any one or more of the pieces of real estate thereby devised, free and discharged of any trust, provided the real estate remaining would, in the opinion of the supreme court, produce a yearly income sufficient to provide for said scholarships, the proceeds derived from the sale to be distributed to The Queen's Hospital as a direct devise of one half and as contingent remainderman of the other half, failing lawful issue of the body of Prince Kunuiakea. In respect to the instructions of the court in answer to question number (5), the decree is also reversed with leave to petitioner to amend the question so that it be limited and confined to the inquiry whether The Queen's Hospital may, by amendment of its charter of incorporation, deviate from the purposes for which it was originally organized without the approval of the court in equity having jurisdiction over public charities. If and when so amended, the answer will be in the negative.

2. Is the decree in the matter of the instant trust estate of May 29, 1935, so far as it affects the legacy to St. Andrew's Priory, bequeathed to it by the twelfth item of the will of the testatrix, *res adjudicata*?

Under the twelfth item of her will the testatrix made the following bequest to St. Andrew's Priory, a school owned and operated by the defendant, The Protestant Episcopal Church in the Hawaiian Islands, a domestic corporation: "I give and bequeath to St. Andrew's Priory of said Honolulu, the sum of six hundred dollars per annum, to be applied towards the maintenance of four yearly scholarships of one hundred and fifty dollars each, to be called 'Queen Emma Scholarships.' And I direct my said trustee or his successor to pay to the head Sister for the time being of said St. Andrew's Priory said sum of six

hundred dollars yearly for said scholarships, the said Sister's receipt to be of sufficient discharge to my said trustee or his successors for the same."

By the allegations of the amended bill, it appeared that pursuant to a decree of the honorable, the circuit judge presiding at chambers in the circuit court of the first circuit, dated May 29, 1935, in the matter of the trust estate of Emma Kaleleonalani, Equity No. 2021, the legacy to St. Andrew's Priory had been increased from $600 to $1400 a year, and that pursuant to said decree Bruce Cartwright, predecessor trustee under the will and of the estate of said decedent, had been paying to St. Andrew's Priory annually the sum of $1400, to be applied towards the maintenance of the aforesaid scholarships.

Upon these facts and the doubts he entertained in respect thereto, the petitioner propounded the following questions: "(10). Whether the order extending the amount of the scholarships to St. Andrew's Priory entered in 1935 is binding upon him, and whether, in the event it is not binding, he should suspend payments to St. Andrew's Priory until the amount paid in excess of the $600 annual payment, directed by Queen Emma in her will and trust to be paid, shall have been compensated by the amounts retained." "(12). Whether the amount paid to the St. Andrew's Priory in excess of the annual sum of $600. by Bruce Cartwright (now deceased), Trustee under the Will and of the Estate of Queen Emma, Deceased, constituted such a breach of trust as to render him liable to said estate during his life and his own estate and executors so liable after his death to a surcharge in such amount." St. Andrew's Priory and the legal representatives of the estate of Bruce Cartwright, deceased, in their respective answers alleged that the decree of May 29, 1935, was *res adjudicata,* and that the petitioner was estopped by said decree from seeking a construction of the language of the will of the

testatrix in respect to said legacy. The Queen's Hospital, in its answer, admitted the facts alleged in the amended bill but did not specially plead *res adjudicata*.

The circuit judge found that by the plain terms of the will the legacy to St. Andrew's Priory was restricted to $600 annually. In reply to question (10) he instructed the trustee "to pay to the head Sister for the time being of said St. Andrew's Priory of Honolulu, said Priory not being shown to be insolvent in any sense, or that there has been any diversion or threatened diversion, the sum of Six Hundred Dollars per annum to be applied toward the maintenance of four yearly scholarships to be called 'Queen Emma Scholarships.' As to the payments made since the back scratching incident in 1935, they relate to past matters, and the court will not instruct upon them, but leaves the trustee and Attorney General to proceed, without prejudice so far as these proceedings are concerned, in a proper court in a proper action to protect the trust fund." Question (12) was left unanswered by the circuit judge, his reply thereto being: "the Court will not instruct in these proceedings in relation to the request contained in number (12), as it relates to past matters, but will leave the trustee and Attorney General to proceed, without prejudice so far as these proceedings are concerned, in a proper court in a proper action to protect the trust fund."

The Protestant Episcopal Church in the Hawaiian Islands, The Queen's Hospital and the executors under the will and of the estate of Bruce Cartwright, deceased, upon appeal assigned the instructions of the circuit judge in answer to question (10) as error, and urged that the decree of May 29, 1935, constituted *res adjudicata*.

Upon this query we are limited to a consideration of the decree to the extent that it involves the legacy to St. Andrew's Priory. The circuit judge declined to answer

questions (9) and (11) which involved the payment to The Queen's Hospital of $190,000 in 1935, and $58,000 in 1938, and upon the authority of *Hawaiian Trust Co.* v. *Galbraith,* 22 Haw. 78, 83, his action in that regard is affirmed.

The terms of the legacy to St. Andrew's Priory are heretofore quoted. In addition thereto, and bearing upon the same subject matter, is the following excerpt from the thirteenth item of the will: "Upon the death of said annuitants, then my said trustee or his successor may sell any one or more of the aforesaid pieces of real estate, free and discharged of any trust, provided the real estate remaining will, in the opinion of the Supreme Court, produce a yearly income sufficient to provide for the aforesaid scholarships. The proceeds derived from the sale of any lands as aforesaid to be divided, one half to the Queen's Hospital, a corporation existing under the laws of the said Hawaiian Islands, and its successors and assigns forever, the remaining half to the said Alexander J. Cartwright and his heirs and assigns, but in trust nevertheless to invest the same, and the income to pay to my cousin Albert K. Kunuiakea, of said Honolulu, during his life, and upon the death of said Albert K. Kunuiakea to pay the principal sum so invested to the lawful issue of the body of said Albert K. Kunuiakea living at his decease, children of deceased child to take by right of representation their parent's share. * * * After the death of all said annuitants, if for any reason it should be deemed advisable in the discretion of my said trustee to sell the remainder of said real estate hereinbefore charged with the payment of said scholarships, I hereby empower my said trustee or his successor with authority to sell said remaining land or lands free and discharged from any trust, and the proceeds thereof to invest in safe and sound property, holding said property charged with the same

trust as aforesaid to pay over the income for the purpose of maintaining said scholarships, rendering the surplus income as aforesaid, one half to the Queen's Hospital aforesaid, and one half in trust for the said Albert K. Kunuiakea during his life, and upon his death to those who are the lawful issue of his body living at his decease, children taking by right of representation their parent's share." It should be borne in mind that by the residuary clause of the will it is provided that if Prince Kunuiakea should die without leaving lawful issue living at his decease, all of the property thereinbefore devised and bequeathed to the issue of said prince living at his decease was given and devised to The Queen's Hospital, and its successors and assigns, forever.

The increase on May 29, 1935, of the amount of the legacy to St. Andrew's Priory from $600 to $1400 a year was in flagrant disregard of the express provisions of the legacy contained in the twelfth item of the will of the testatrix. The provisions of the legacy are plain and unambiguous, and the increase in the annual amount payable to the Priory was clearly error. Upon argument in this court upon this appeal, the attorney for the legal representatives of Bruce Cartwright, and the attorney for The Queen's Hospital, candidly conceded that the circuit judge, in so doing, was clearly wrong. But, they rejoined, whether right or wrong, the decree is *res adjudicata* and binding upon petitioner as the privy in interest of Bruce Cartwright, his predecessor trustee.

For the decree of May 29, 1935, to be available to these respondents as a bar in this case, it is necessary that it affirmatively appear, among other things, that they or their privies were parties to the proceedings in which the decree was entered and the issue here involved litigated and decided. It cannot be successfully maintained that the decree in question did not authorize the trustee to increase

the annuity to the Priory from $600 to $1400. But unless the proceeding in which the decree was entered was an adversary one, the decree did not become *res adjudicata* as to him or his privy, the present petitioner, and the issue thereby litigated and decided may be again litigated in the instant case. Moreover, if neither the Priory or its principal, The Protestant Episcopal Church in the Hawaiian Islands, nor The Queen's Hospital were parties to that proceeding, the same issue therein litigated and decided may be relitigated. An issue litigated and decided upon an *ex parte* proceeding may always be relitigated. And one not a party to a proceeding cannot plead that the issue therein litigated and decided is *res adjudicata*.

One becomes a party to a proceeding by the issue of service of process or by voluntarily appearing and submitting to the jurisdiction of the court. No process was prayed or issued and obviously none served. The Priory and its principal, The Protestant Episcopal Church in the Hawaiian Islands, and The Queen's Hospital have wholly failed to show that they were parties to the proceeding of May 29, 1935, unless the so-called respective separate consents of the Priory by The Protestant Episcopal Church in the Hawaiian Islands and The Queen's Hospital, hereinafter referred to, were voluntary appearances by which the consenter submitted itself to the jurisdiction of the court.

No formal appearance was entered by or for the Priory or its principal or by or for The Queen's Hospital. The effect of the so-called consents upon which the consenters rely to render said decree a consent decree and therefore *res adjudicata* as to the matters therein adjudged is best appreciated by reference to the record of the proceedings had, culminating in said decree.

On May 29, 1935, Bruce Cartwright, as trustee under the will and of the trust estate of Queen Emma, petitioned

the presiding judge at chambers in equity of the first circuit court, in the matter of the trust estate of Queen Emma, Equity No. 2021, for authority, among other things, "to pay to St. Andrew's Priory out of the income of said trust estate the total annual sum of $1400.00, being payment for four full scholarships of $350.00 each." In support of the prayer of his petition, the petitioner attached a copy of the will of his decedent and alleged "That at the time the will was drawn a full scholarship was $150.00 for the year, whereas now a full scholarship is $350.00; that petitioner firmly believes from his knowledge of the intentions of the testatrix, Queen Emma, and from the statements of her intimate friends and advisers and also from other facts including the original value of the trust estate and the original amount of the net income derived therefrom, that the main purpose of the testatrix after providing for the payment of the annuities to individuals was to provide for the maintenance of four full scholarships at St. Andrew's Priory and that she intended to provide that said scholarships should continue to be paid in full, although this might require the payment of a larger sum than the original amount of $150.00 for each scholarship; * * * that petitioner has been advised by his attorneys that the said intention of the testatrix to provide for the payment of said scholarships in full in said larger amount than the sum specifically mentioned is not clearly set forth in said will and that he should secure the approval of this Court before increasing the provision for said scholarships beyond the $600.00 per annum heretofore paid by him for said purpose." The petition was dated May 10 preceding and was "subscribed and sworn to" by the petitioner before a notary public. Also incorporated in the prayer of the petition was a request for authority "to pay to the Queen's Hospital the * * * sum of $190,000.00 out of the principal of said trust estate." In support of the request

for authority to make payment of the sum of $190,000 to The Queen's Hospital, the petitioner alleged in his petition that all of the individual annuitants entitled under the will to annuities to be paid out of the income of the trust estate established by the will had theretofore died; that Albert K. Kunuiakea had theretofore died without leaving lawful issue surviving him; that the United States Government in a certain action in eminent domain lately pending had condemned, paid for and taken certain of the lands belonging to his decedent's estate, and he believed that the remainder of the real estate included in the trust estate would produce a yearly income sufficient to provide for the Queen Emma Scholarships at St. Andrew's Priory in Honolulu in the larger sum of $350 each or a total of $1400 yearly; that he desired to pay to The Queen's Hospital out of the moneys paid him pursuant to the condemnation award the sum of $190,000, said sum being part of the principal of the trust estate, and was advised by his attorneys, and believed, that he had authority in his discretion to make such payment on receiving the opinion of the court; that The Queen's Hospital was ready and willing to receive the same and that St. Andrew's Priory was willing to have said payment so made by petitioner to The Queen's Hospital on condition that the payments of said scholarships were increased as in said petition set forth, and the petitioner requested that the court declare its opinion as to the sufficiency of income to provide for said scholarships and to authorize petitioner to make said payment to said Queen's Hospital.

The petitioner was represented by counsel. The title of the cause did not include the names of any parties. The petition did not contain a prayer for process and no process issued.

With the petition there was filed in the same matter a document entitled "Consent of St. Andrew's Priory."

After acknowledging receipt of a copy of the petition of Bruce Cartwright, trustee, this consent recites that "In consideration of the filing herein on the 29 day of May, 1935 by The Queen's Hospital of its consent to the granting of said petition and more specifically its consent to the payment annually hereafter to it, St. Andrew's Priory, of the sum of $1400.00, being payment for four full scholarships of $350.00 each, St. Andrew's Priory hereby consents to the entering of an order in the above entitled matter granting the prayer of said petition, and without limitation to the generality of the foregoing hereby consents that said order direct Bruce Cartwright, trustee under the will and of the estate of Emma Kaleleonalani, deceased, to pay out of the principal of the trust estate the sum of $190,000.00 to The Queen's Hospital, a beneficiary of said trust estate * * * and to pay out of the income of said trust estate hereafter the annual sum of $1400.00 to it, St. Andrew's Priory, said sum being payment for four full scholarships of $350.00 each." This consent is dated May 15, 1935 and was signed by St. Andrew's Priory by the Bishop of Honolulu, its agent, and by The Protestant Episcopal Church in the Hawaiian Islands, its trustee, by the bishop, its president.

Also filed with the petition of the trustee in the same matter of said estate was a document entitled "Consent of The Queen's Hospital." This consent, after acknowledging receipt of the petition of the trustee, recites that "In consideration of the payment to it by said Bruce Cartwright, trustee, of the sum of $190,000.00 out of the principal of said trust estate as proposed by said trustee in his said petition and in consideration of the filing herein on the 29 day of May, 1935 by St. Andrew's Priory of its consent to the granting of the prayer of the petition, and more specifically its consent to the payment by Bruce Cartwright, trustee, to The Queen's Hospital of the sum

of $190,000.00 out of the principal of the trust estate, The Queen's Hospital hereby consents to the granting of the prayer of the petition and without limitation to the generality of the foregoing hereby consents to the entering in the above entitled matter of an order directing said trustee to pay annually hereafter to St. Andrew's Priory, beneficiary of said trust estate, out of the income of the trust estate the sum of $1400.00, being payment for four full scholarships of $350.00 each, * * * and directing said trustee to pay to The Queen's Hospital the sum of $190,-000.00 out of the principal of said trust estate. Said The Queen's Hospital hereby agrees to accept said money from said trustee for its corporate purposes." This consent is dated May 13, 1935, and is signed by The Queen's Hospital by its president and treasurer, Hawaiian Trust Company, Limited, by the latter's vice-president and assistant vice-president.

A hearing was had upon the petition immediately. The only evidence given in support thereof was that of the petitioner himself. In respect to the legacy of The Queen's Hospital he testified that the witness's father was a friend of Queen Emma and her adviser; that he had talked with his father and Sister Albertina, a very close friend, and Miss Lucy K. Peabody, and they told him that it was her (the Queen's) intention to maintain four full scholarships perpetually. At the close of the proceedings a decree was entered in which the court, after referring to the consents filed by The Queen's Hospital and the St. Andrew's Priory, found that in his opinion the real estate remaining in the trust estate would produce a yearly income sufficient to provide for the "Queen Emma Scholarships" at St. Andrew's Priory in Honolulu in the said amount of $350 each, or a total of $1400 yearly, and that the payment by the trustee out of the net income of the trust estate to St. Andrew's Priory of said total sum of

$1400 for four full scholarships to be "in accordance with the purpose and intent of the testatrix," and that the trustee was authorized by said will and should be authorized by the court to pay to The Queen's Hospital the aforesaid sum of $190,000 out of the principal of said trust estate, and ordered that the prayer of the petition be granted; that in the opinion of the court the real estate remaining in the principal of the trust estate after the payment of said sum of $190,000 would produce a yearly income sufficient to provide for the said scholarships of St. Andrew's Priory, and that petitioner be and he was thereby authorized to pay to The Queen's Hospital the said sum of $190,000 out of the principal of said trust estate, and to pay to St. Andrew's Priory out of the income of said trust estate the total annual sum of $1400, the payment for four full scholarships of $350 each.

Included in the petition was also a prayer for authority to expend the sum of $1280 for the perpetual care of a cemetery lot and the consent of the Priory and consent of The Queen's Hospital also included consent to the trustee making such expenditure. The decree contained the necessary authority.

Pertinent to this inquiry are the earlier actions of the parties in respect to this same subject matter. On May 18, 1928, there was filed in the circuit court of the first circuit, addressed to the presiding judge at chambers in the matter of the trust estate of Emma Kaleleonalani, deceased, Equity No. 2021, a petition by Bruce Cartwright, as trustee of said trust estate, requesting instructions upon the subject of the legacy to St. Andrew's Priory. At that time it was sought to raise the annual amount payable to the Priory from $600 to $1200. The petition alleged that the head sister in charge of St. Andrew's Priory had requested the trustee to increase the payment to St. Andrew's Priory for the Queen Emma Scholarships from

$600 to $1200 per annum, and after reciting four possible constructions of the will which would permit, respectively, one of four suggested methods of handling the matter, concluded with the allegation that he was uncertain as to his duties, and requested the advice and direction of the court in the premises; that he felt there should be a full hearing upon the matters therein set forth and that in such action all parties in interest should be joined. The petition set forth the names of two annuitants, and the St. Andrew's Priory and The Queen's Hospital, as parties in interest, and prayed that process issue, directed to them, to appear and answer or plead respecting their respective claims and contentions as to the rights and duties of the trustee in the premises, and that after a full hearing upon all the matters in his petition set forth, the court advise him as to his duties therein. On the same day chamber summons was issued, and there was incorporated therein a direction that the parties summoned answer or plead to the annexed bill of instructions of the trustee, presenting their respective claims and contentions as to the rights and duties of the trustee in the premises.

The Queen's Hospital formally answered the petition, and in response to the order of court that the respondents present their respective claims and contentions, submitted "that the provision contained in the will of the late Queen Emma in favor of St. Andrew's Priory is clear and un-ambiguous; that said provision did not provide for the maintenance of four scholarships, but was a gift by way of an annuity of the definite sum of six hundred dollars per annum 'to be applied *towards* the maintenance' of four scholarships; and the express direction to the trustee is 'to pay to the head sister for the time being of said St. Andrew's Priory said sum of six hundred dollars yearly for said scholarships,' neither more nor less," and prayed

that the trustee be advised and instructed in accordance with his claim and contention.

After the answer of The Queen's Hospital had been filed, The Protestant Episcopal Church in the Hawaiian Islands, as owner of St. Andrew's Priory, filed its answer to the bill of instructions, stating that it withdrew its claim theretofore made that St. Andrew's Priory should be paid by the trustee the sum of $1200 per year instead of the sum of $600 per year provided in the will of the testatrix, and expressed its willingness that the proceedings be discontinued.

Bruce Cartwright, trustee, on December 17, 1928, withdrew his bill for instructions and discontinued the same without prejudice. An order of court was entered accordingly.

The petition of Bruce Cartwright, trustee, of May 29, 1935, was a mere *ex parte* petition. It is entitled in the matter of the trust estate. No parties are named. It contains no prayer for process. The prayer contains no demand that parties in interest appear and make answer to the allegations of the petition. The petition is not verified by the petitioner. It was merely "subscribed and sworn to" before a notary public.

Nor was the petition a bill by the trustee for instructions. It contains none of the necessary allegations of a bill for instructions. It does not allege, similarly as its 1928 predecessor, nor as in the instant case, that the trustee is in doubt upon questions of law involved in the administration of the trust, nor does it pray the instructions of the court in respect thereto. On the contrary, it prays judicial approval of predetermined action by the trustee. In his petition the trustee alleged that in his opinion the intention of the testatrix was "to provide for the maintenance of four full scholarships * * * and that she intended to provide that said scholarships should continue

to be paid in full, although this might require the payment of a larger sum than the original amount of $150.00 for each scholarship"; that petitioner desires "to pay to the said Queen's Hospital * * * the sum of $190,000.00, * * * and is advised by his attorneys and believes that he has authority in his discretion to make such payment"; that petitioner believes that "the remainder of the real estate included in the trust estate will produce a yearly income sufficient to provide for the 'Queen Emma Scholarships' * * * in the larger amount of $350.00 each." The prayer prayed accordingly.

The proceeding was not an adversary one. Revised Laws of Hawaii 1935, section 4705, provides for the issuance of process by the clerk upon the filing of petitions in equity cases. In the absence of a prayer for process it may be assumed that the issuance of process was not intended. The acts of the parties show that it was not. Revised Laws of Hawaii 1935, section 4706, prescribes service of process in proceedings in equity. In the absence of process, service of process obviously was not made. By the absence of prayer for process, it is apparent that no adversary proceeding was contemplated. In fact the evidence admits of the finding that the petition, consents and decree were all prepared by the same person and that the decree was prepared in advance of the filing of the petition and hearing. We have personally examined the original petition of the trustee, the consents of St. Andrew's Priory and The Queen's Hospital, and the decree. All are upon paper of the same type and bear the same watermark. Dates that were inserted in blanks left for that purpose in the consent of St. Andrew's Priory, the consent of The Queen's Hospital, and the decree appear to be in the same handwriting. The petition and consents were filed approximately at the same time; there is but a minute intervening between the filing of each. The file

mark on the decree shows that it was entered twenty minutes after the petition was filed; in other words, immediately after the conclusion of the hearing.

The only attorneys of record are the attorneys for the petitioner. The rules of the circuit court of the first circuit, in force in 1935, required that all pleadings and papers include a flyleaf upon which shall be noted, among other things, the attorney or attorneys representing the party on whose behalf the document is filed. The attorneys representing the petitioner are noted upon the flyleaf of the petition. There is not noted upon the flyleaves of the respective consents, or otherwise, the attorney or attorneys representing the party on whose behalf the consent was filed. No appearance, formal or otherwise, was filed by any attorney on behalf of the Priory or The Queen's Hospital. No actual appearance, either personally or by counsel, was made by them at any stage of the proceedings. What the agreement was between the parties which culminated in the proceedings undertaken by Bruce Cartwright, as trustee, is not before us. But the acts of the parties are fairly subject to the inference that a prior agreement existed between them to do what was subsequently done by each of them, including the agreement that upon the hearing no one, except the petitioner-trustee, should be personally present or represented by counsel.

Revised Laws of Hawaii 1935, section 4709, requires that a defense in equity shall be made by demurrer, plea or answer. To make defense by way of answer it is incumbent upon a party respondent in a suit in equity, to answer fully, directly and specifically, with positiveness and certainty, all material matters charged which affect the relief sought against him. A general denial is not sufficient. The answer with certainty should confess, avoid, deny or traverse all material matters. (Story's *Eq. Plead.*

§ 846, *et seq.*; *Burke* v. *McLaughlin,* 246 Mass. 533, 141
N. E. 601, 602; *Coan* vs. *Cons. Gas E. L. & P. Co.,* 126 Md.
506, 97 Atl. 921, 922.) ·Decree *pro confesso* is a proper
procedure on default. (*Kahue* v. *Palaualelo,* 25 Haw.
805.) The respective consents filed by the Priory and The
Queen's Hospital were not pleadings. They were merely
evidence of their private agreement between themselves
and, as such, should not have been filed except as exhibits,
if and when admitted in evidence, upon the hearing. The
consents were merely evidentiary and did not constitute
a pleading contemplated by section 4709, *supra.*

The consents, when analyzed in the light of their cause
and legal effect, amounted to nothing more than a private
agreement by the terms of which each consenter waived
objections to a decree favorable to the other consenter,
provided the decree was also favorable to itself. In ad-
dition to the direct interests in the annual amount of the
legacy, the Priory was interested in preserving the trust
*res* so that it would produce annually income sufficient to
pay said legacy. On the other hand, The Queen's Hospi-
tal, in addition to the direct payment to it of $190,000,
was interested in the amount annually paid the Priory.
Under the provisions of the will of the testatrix, after the
death of the annuitants, The Queen's Hospital was en-
titled to all surplus income after the discharge of the leg-
acy in favor of the Priory, and in the event of sale of real
estate, a prospective beneficiary of the proceeds, provided
sufficient real estate remained to provide annually the
amount of the legacy payable to the Priory. Hence, to
the extent that the annual amount paid to the Priory ex-
ceeded the amount bequeathed by the testatrix, the income
payable to The Queen's Hospital would be corresponding-
ly decreased. And if the position taken by The Queen's
Hospital, upon the occasion of the 1928 proceeding, was
correct, its consent in 1935 was tantamount to a gift to

St. Andrew's Priory of such excess, to the detriment in that amount of the charity for which it was organized.

Moreover, the consents to the extent that they agreed in advance upon the questions of law to be decided by the court were of no avail. Parties cannot, by their admissions of law arising out of an undisputed state of facts, bind the court to adopt their view. (*The People* v. *P., Ft. W. & C. Ry. Co.,* 244 Ill. 166, 91 N. E. 48.) Three questions were presented by the petition, two of which involved pure questions of law, *viz.*: the intention of the testatrix in respect to the legacy in favor of St. Andrew's Priory, and the duty of the trustee, under the provisions of the will, to make distribution of the proceeds of condemnation of real estate. The terms of the will were not ambiguous. These questions required judicial determination. They required the exercise of judicial functions. It might be said that the consents of the respective parties could be considered by the court in respect to the question whether, after the payment of the $190,000 to The Queen's Hospital, sufficient real estate remained to provide income sufficient to discharge the legacy to the Priory. But until the legal question of the duty of the trustee to make distribution was determined, the question of whether sufficient real estate remained could not be considered.

Obviously, a consent by one possessing adverse interests in the subject matter of a proceeding before a circuit judge in equity that a decree be entered in his favor, has no legal effect and is a pure absurdity. The necessary element of estoppel as a concomitant of consent cannot arise. Where, as here, questions of law are presented to the court for its judicial determination, a consent by one possessing adverse interests that a decree be entered in favor of another whose interests are adverse, provided the decree be also favorable to the consenter, has no legal effect and is no less an absurdity.

In the absence of pleadings by the parties adversely interested, there were no issues before the court. The hearing was conducted by the attorney for the petitioner. Neither the Priory nor The Queen's Hospital was personally present or represented by counsel. The situation is patent. It appears from the evidence taken upon the merits that in May, 1935, Bruce Cartwright was not alone the trustee of the trust estate created by the will of Queen Emma, but was also one of the directors (formerly called trustees) and secretary of The Queen's Hospital. Under the amended charter of The Queen's Hospital as it then existed, the board of directors were seven in number. This inconsistency in interests was not disclosed to the court. The only witness in support of the petition was the trustee, Bruce Cartwright. No other witness was called. The evidence that he gave upon the hearing, as to the intention of the testatrix in the face of the plain and unequivocal language of the will, was absolutely incompetent and irrelevant. (*Smith* v. *American Missionary Association*, 240 Mass. 26, 132 N. E. 358, 359.)

Neither the Priory or its principal, The Protestant Episcopal Church in the Hawaiian Islands, nor The Queen's Hospital, by the consents filed by them, became parties to the proceeding. No one can be made a party respondent in a cause, so as to become bound by the decree, except by process of law, or by his own voluntary submission of his person to the jurisdiction of the court. That in each consent each consenter acknowledged receipt of a copy of the petition, did not dispense with service of process, or, in the alternative, voluntary appearance. Neither the Priory, or its principal, nor The Queen's Hospital submitted its person to the jurisdiction of the circuit judge at chambers. The evidence admits of the finding that the consents of the Priory and The Queen's Hospital were filed in the clerk's office of the circuit court of the

first circuit by the petitioner, Bruce Cartwright, trustee, or ·his agent or attorney. They were simply exhibits in support of the allegations of the petition "that said Queen's Hospital is ready and willing to receive the same [$190,000] and that St. Andrew's Priory is willing to have said payment so made by petitioner to said Queen's Hospital on condition that the payments for said scholarships are increased as hereinafter set forth; * * * that the Queen's Hospital has consented to the payment by petitioner out of the net income of the trust estate of the said larger sum of $350.00 for each scholarship or a total of $1400.00 annually for said four full scholarships in consideration of the consent of St. Andrew's Priory to the payment to said Queen's Hospital of the·aforesaid sum of the principal of the trust estate." It cannot be said that, by the mere filing by the petitioner of these consents, the consenters voluntarily submitted their respective persons to the jurisdiction of the circuit judge at chambers.

But, say the respondents this is a consent decree and operates as a bar, similarly as an ordinary decree. This decree was not a consent decree. No express consent by the trustee to the entry of the decree is of record.[26] A consent decree is an agreement of the parties under the sanction of the court as to what the decision shall be. (*Hodgson* v. *Vroom*, 266 Fed. 267; *Wilson* v. *Haber Bros.*, 275 Fed. 346, 347; *Davey Tree Expert Co.* v. *Frost & Bartlett Co.*, 300 Fed. 680, 681.) The court was not called upon nor required to perform the mere ministerial function of approving the decree, the terms of which had been agreed upon by all the parties in advance. The record affirmatively shows that the decree, however it may have been influenced by the presence of the consents, was the result of the exercise of judicial functions upon questions of law and fact.

---

26 *The Ansaldo San Giorgio I*, 73 F. (2d) 40, 41; *State ex rel. Delmoe* v. *District Court*, 100 Mont. 131, 46 P. (2d) 39.

It cannot be said that the decree was rendered by consent as far as it determined the intention of the testatrix in respect to the annual amount of the legacy to the Priory. (See *Lee* v. *Lee,* 77 Ala. 412; *Rigby* v. *Lefevre,* 58 Miss. 639.)

Under all the circumstances we cannot say that the proceedings had before the circuit judge at chambers upon the petition of Bruce Cartwright, trustee, of May 29, 1935, were anything more than *ex parte* and that the legal effect of the decree of that date, so far as it concerns the legacy to St. Andrew's Priory, is controlled by the decision of this court in the case of *Kealoha* v. *Castle,* 17 Haw. 45, *aff'd* 210 U. S. 149, in which this court held that a decree secured *ex parte* does not constitute *res adjudicata.*

Accepting, however, as correct the construction placed by respondents upon the decree of May 29, 1935, with all its implications, and assuming that it was a consent decree to which Bruce Cartwright, trustee, impliedly if not expressly consented, the question still remains whether said decree possesses any greater legal efficacy as a bar than the contract between the parties upon which the same was predicated. Obviously, if the contract of the parties was legally unenforceable, the consent decree predicated thereon is equally unenforceable and does not constitute *res adjudicata.* For the decree of May 29, 1935, to be available to these respondents as a bar in this case, it is necessary that it affirmatively appear that it was predicated upon a valid and subsisting contract between the parties to the decree. If the contract was not within the power and authority of the parties to make, it can give no legal support to a decree based thereon.

None of the parties to the agreement upon which the decree is predicated was authorized or empowered to undertake that despite the plain terms of the will of the testatrix, by which a legacy of $600 per year was given to

St. Andrew's Priory, that the amount thereof be increased from $600 to $1400 a year. For the trustee to so undertake was clearly a breach of trust. For The Queen's Hospital, which is entitled to all surplus income, to agree that the trustee might violate the plain terms of the will of the testatrix and that $800 a year be diverted from the public charity which was the object of the Queen's bounty was clearly *ultra vires* and void. The Priory is a school. Neither it nor its principal, The Protestant Episcopal Church in the Hawaiian Islands, is carrying out purposes similar to those for which The Queen's Hospital was created. "A corporation of this character is created by law for a definite purpose, and it cannot donate its funds to another corporation organized for similar or other purposes, except that such donation assist to carry out the purpose for which such corporation was created." *Northwest. Un.* v. *Wesley Hospital*, 290 Ill. 205, 125 N. E. 13, 17. The action of the Priory was equally unavailing. It was bound by the plain terms of the will of the testatrix and it had no power or authority to agree with anyone to circumvent their provisions. If the trustee, in his discretion, saw fit to make distribution to The Queen's Hospital of the proceeds of converted real estate, there was nothing that the Priory could do to prevent it. Its only interest in the proposed distribution was the preservation in the trust *res* of sufficient property to produce annually the amount of its legacy. The suggestion made by it upon argument in this court that it might have instituted litigation calculated to postpone indefinitely the distribution to The Queen's Hospital of the award in the condemnation proceedings cannot be seriously considered. Under the circumstances the agreement of the parties upon which the decree was predicated was *ultra vires* and void. The agreement in respect to the increase of the legacy to the Priory not being divisible from the remaining provisions

of the agreement, the entire contract must be considered void.

The agreement upon which the decree is predicated being void, the conclusion is inevitable that the proceedings culminating in the decree of May 29, 1935, were collusive; that the said decree was collusive; and that said decree constituted a fraud depriving it of any legal effect as a bar in the instant case. It is not necessary that actual fraud appear. To consent to a decree, the legal effect of which is to violate the plain terms of a will and to divert moneys given by a testatrix to a public charity for purposes other than directed by her will "is itself a fraud, no matter how well intentioned, or how much the parties believed in their power to make it. * * * Its effects are the same, and it was none the less fraudulent in contemplation of law because the parties got nothing for the wrong, or thought they were doing right." *Kelly* v. *Town of Milan,* 21 Fed. 842, 868.

The circuit judge, in his instructions given in response to question (10), was correct and the decree in that respect is affirmed. Our conclusions, however, are not to be taken as determinative of the rights of the parties in respect to payments made by the predecessor trustee, Bruce Cartwright, to St. Andrew's Priory, pursuant to the decree of May 29, 1935, to the extent that it exceeded $600 annually. It is sufficient for the purposes of this case to say that annual payments to St. Andrew's Priory upon and after decree *nisi* should not exceed $600.

3. Does this appeal present for review instructions given by the circuit court in response to question number (2) as amended?

The original bill contained the following request for instructions: "(2). Whether the Trustee is obliged to sell the real property and make distribution to The Queen's Hospital or to such other objects as the Court may direct."

After the cause was submitted, this question was amended to read as follows: "whether the trust created by Queen Emma Kaleleonalani has terminated, or should now be terminated, in whole or in part, and the assets, in whole or in part be distributed, and in that connection whether the Trustee is obliged to sell, in whole or in part, the real property in said trust estate and make distribution in whole or in part, and if the whole should be distributed to whom and in what amounts it should be distributed, and if the trust should be terminated as to a part thereof and distributed what part should be so distributed and in view of the allegations herein whether such distribution should be made to the Queen's Hospital."

None of the answers of the respondents was amended to meet this amendment.

The court instructed the trustee, in response to question (2), as amended, "the Trustee be and he is hereby instructed that the trust is not now and should not now be terminated in whole or in part, and that the trustee should not distribute the assets in whole or in part, and that the trust is not a dry trust and that the trustee is not obliged to sell the real property and make distribution to the Queen's Hospital, but on the contrary should use his own discretion as provided for in the Will."

The St. Andrew's Priory, represented by The Protestant Episcopal Church in the Hawaiian Islands, demurred to the original bill upon the ground, among others, "that the real estate remaining and sufficient to provide income for said scholarships shall be conveyed to this respondent impressed with the trust of using the income therefrom to provide for said scholarships." In its answer the subject of question (2) is not referred to. The overruling of the demurrer was assigned as error. No error was assigned to the overruling of the demurrer on the specific ground quoted, nor is it argued in the brief. The instructions of

the court in response to question (2), as amended, are not assigned by it as error.

. The Queen's Hospital, in its answer, ignored the subject. The instructions of the court in response to question number (2) are assigned by it as error, but in its opening brief in this court, it stated "The question propounded by the petitioner as to the termination of the trust is not a live question, and needs no answer." After referring to the case of the *Queen's Hospital* v. *Cartwright*, 19 Haw. 52, and the effect of that decision, it concludes with the observation, "The trustee does not require any instruction on this point at this time. If and when a proceeding shall be brought by the Hospital and the Priory to terminate the trust, the subject will of course be fully dealt with." The petitioner in his brief as appellee practically took the same position. The executors under the will and of the estate of Bruce Cartwright, deceased, were not affected by the instructions requested in response to question number (2) as originally propounded or as subsequently amended. They offered no suggestion in their answer upon the construction of the will in that regard. While the instructions of the court in response to question number (2), as amended, are assigned by them as error, they are not discussed in the brief.

The subjects of question number (2) as originally propounded and as subsequently amended were proper subjects of instruction in this proceeding.[27] That, as alleged in the amended bill, "it would not be for the benefit of said estate to sell the real property now in said estate and distribute the proceeds thereof, inasmuch as the return from said real property is substantially in excess of any return that could be secured with the safety compatible with trust investments from the proceeds of sale of such property,"

---

[27] 2 Perry, Trusts (6th ed.) § 928.

did not prevent the court from considering the question propounded and instructing the trustee accordingly. While the court could not control the discretion of the trustee, the latter was entitled to protect himself against any claim that he was arbitrarily refusing to exercise the discretion committed to him under the terms of the will.

Under the circumstances, the assignment of error in respect to the instructions of the court in response to question number (2), as amended, should be considered as abandoned. (See *Territory* v. *Ota, ante* p. 80.) It is too much to ask of this court to undertake the review of assignments of error in respect of which appellants are indifferent.

To the extent that the instructions given by the court are responsive to question number (2), as amended, the same are affirmed, except as the language included in the instructions of the court "that the trustee should not distribute the assets in whole or in part" may imply that the trustee may not make distribution of the proceeds of sale of real estate made or to be made by him in his discretion, provided the real estate remaining will in the opinion of the circuit judge provide a yearly income sufficient to provide for the aforesaid scholarships, the same is reversed consistently with the disposition of language of similar import contained in the instructions of the court in answer to question (1).

A decree incorporating our conclusions will be entered upon presentation.

*A. G. M. Robertson* (*Robertson, Castle & Anthony* on the briefs) for respondent-appellant The Queen's Hospital.

*A. Perry* (also on the briefs) for respondent-appellants executors of the will of Bruce Cartwright, deceased.

*H. Edmondson* (*Smith, Wild, Beebe & Cades* on the briefs) for respondent-appellant St. Andrew's Priory.

*E. K. Kai,* Attorney General (also on the briefs as Acting Attorney General), for respondent-appellant Territory of Hawaii.

*W. B. Stephenson* (*F. E. Thompson* with him on the brief) for petitioner-appellee.